[Civ. No. 21191. Second Dist., Div. Two. Nov. 25, 1955.]

Guardianship of the Person and Estate of REBECCA RAE LEVY, a Minor. LULA P. STOGSDILL et al., Appellants, v. MARIAN ARNOLD, Respondent.

238

Hooper, Miller & Astor and James B. Ogg for Appellants.

Krag & Sweet, William L. Mock, Donald O. Krag and David T. Sweet for Respondent.

FOX, J.—The appellants herein are Mrs. Lula P. Stogsdill and William S. Stogsdill, her son. They appeal from: (1) an order revoking the appointment of Mrs. Stogsdill as guardian of Rebecca Rae Levy, a minor; (2) a judgment granting Marian Arnold's petition for appointment as Rebecca's guardian, and (3) judgments denying their individual petitions for appointment as guardian.

The principal questions for determination are: (1) the propriety of the order vacating Mrs. Stogsdill's appointment as guardian; (2) whether the appointment of Marian Arnold, a nonresident, as guardian was contrary to law and an abuse of discretion, and (3) whether the court erred in rulings on the admissibility of evidence.

Rebecca was born to Raymond and Helen Levy on September 10, 1951. Raymond died on October 6, 1953. Helen Levy died on July 8, 1954, in Alhambra, California. When Helen died, her mother, Mrs. Bertie Miller, and her sister, Mrs. Marian Arnold, were residing in Lafayette, Indiana. Mrs. Arnold, the wife of Lt. Col. Carl Arnold, was in the process of moving to Baltimore, Maryland, where her husband was being transferred on a military assignment. Helen's other sister, Mrs. Edna Gonzales, was living in Los Angeles County. When Helen entered the hospital during her fatal illness, Rebecca was left with Mrs. Stogsdill, Helen's aunt, who also resided in Alhambra. Mrs. Stogsdill's son, William, and his wife, Marlou, helped look after Rebecca in the weeks after Helen's death.

On the day of Helen's death, Mrs. Stogsdill consulted an attorney, James Ogg, with reference to the probate of Helen's estate and the matter of establishing a guardianship for Rebecca. Mr. Ogg thereupon prepared a petition for the appointment of Mrs. Stogsdill as guardian and had it filed the following day, July 9, 1954, the hearing being set for July 27, 1954. Also, on July 9, 1954, Mr. Ogg wrote to Rebecca's grandmother, Mrs. Miller. His letter reads in part:

"Whenever a minor has any estate or property, it is neessary that a guardian be appointed to take care of his person and estate. If Mrs. Stogsdill is appointed Rebecca's guardian, she has prior right to be appointed administratrix of Helen's estate. If she is not appointed Rebecca's guardian, a California public administrator will take over the administration of the estate and two fees will have to be paid, one to the public administrator and one to the county counsel. . . .

"It is necessary that your sister [Mrs. Stogsdill] be appointed Rebecca's guardian *in order for her to handle the administration of Helen's estate,* and she will have to post a surety bond equal to the amount of the estate. If you decide that you want to be Rebecca's guardian and adopt her, *the California guardianship proceedings can be terminated after Helen's estate is closed,* and the money on hand forwarded to you upon receipt of a certified copy of Letters of Guardianship from the Clerk of the Court that appoints you guardian. If you should be appointed Rebecca's guardian, you would handle her estate under the jurisdiction and control of the Court that appointed you guardian, and you would have to post a bond for the faithful performance of your duty, as Mrs. Stogsdill will have to post in California." (Emphasis added.)

The letter contained no reference to the fact that Mrs. Stogsdill's guardianship petition had already been drawn and was being filed the same day as the letter was written.

On July 14, 1954, George E. Weigle, an Indiana attorney, replied to Mr. Ogg's letter in behalf of Mrs. Miller. The pertinent part of his letter reads:

"In reply to your questions, Mrs. Miller wishes to advise that it meets with her approval to have Mrs. Lula Stogsdill appointed as administratrix of the estate of Helen Levy, and also *temporary guardian* for Rebecca Rae Levy. . . .

"In regard to the possibility of Mrs. Miller adopting Rebecca, *we want to report that Helen Levy requested in writing that her sister, Mrs. Carl Arnold, adopt and raise the child in case of her death,* and she and her husband are willing to do this, if this is to the best interests of the child. . . .

"Lt. Col. Arnold is being relocated in Baltimore, Maryland, and they feel it would be best for them to find housing accommodations in Baltimore before they come to California to get the child which will be approximately September 15 by the time they get moved and settled. . . ." (Emphasis added.)

On July 19, 1954, Mr. Ogg wrote to Mr. Weigle, stating in part:

"We are presenting a petition to the Court to have Mrs. Stogsdill appointed Rebecca's guardian, and as soon as Letters of Guardianship are issued she will apply for Letters of Administration on Rebecca's mother's estate.

"There is no authority in California to appoint a temporary guardian or a guardian for a limited period of time. *However, Letters of Guardianship may be revoked by an order of Court at any time.*"

Mr. Ogg testified that when he wrote this letter he was aware that a guardian could be removed only for cause.

On July 27, 1954, Mrs. Stogsdill's petition for appointment was granted. Two significant factors should be pointed out in connection with the petition: First, Mrs. Stogsdill described herself therein as Rebecca's aunt, when her true relationship was that of great-aunt[1]; second, she declared herself to be Rebecca's only relative residing in California when the fact was that Rebecca's aunt, Mrs. Edna Gonzales, was then resident in Los Angeles County, and, according to Mrs. Gonzales, Mrs. Stogsdill had talked to her just a few days before Helen died.[2] At the brief ex parte guardianship hearing, Mrs. Stogsdill reaffirmed the truth of the facts erroneously set forth in her petition.

On August 3, 1954, Mr. Weigle wrote Mr. Ogg inquiring when the Arnolds should come and get Rebecca, since they were moving to Baltimore and felt that the sooner they got her the fewer adjustments she would have to experience. Having received no reply, he dispatched another letter on September 8 asking for a response to his letter. Mr. Ogg

---

[1] This misstatement enabled Mrs. Stogsdill to procure her appointment without the investigation called for pursuant to section 721 of the Los Angeles County Probate Policy Memoranda, which reads: "A guardian of the person of a minor will not be appointed until a written report has been filed by the probation officer pursuant to Section 1443 of the Probate Code, unless the proposed guardian is a parent, grandparent, brother, sister, aunt, or uncle by blood, of the minor. However, pending the filing of the report, the Court, on a proper showing, will make an order for temporary custody of the minor as is authorized by Section 1442 of the Probate Code."

[2] This concealment foreclosed any possibility that the court might require notice of the proceedings be given to Mrs. Gonzales under section 1441 of the Probate Code, which reads in part: "Before making the appointment, such notice as the court or a judge thereof deems reasonable must be given to the person having the care of the minor and to such relatives of the minor residing in the state as the court or judge deems proper."

testified he was absent from his office frequently during the summer of 1954 and fell behind in his correspondence. Mrs. Arnold, disturbed by this silence, wrote Mr. Ogg on September 13 with reference to when she might come for Rebecca and how guardianship might be transferred to her. On September 14, Mr. Ogg's secretary wrote Mr. Weigle, advising him of Mrs. Stogsdill's appointment as guardian. On October 5, 1954, Mr. Ogg wrote to Mrs. Arnold at her Baltimore residence informing her that Mrs. Stogsdill had been appointed guardian on July 27 and that a court order would be required to have Mrs. Stogsdill removed and Rebecca taken to Maryland. On October 15, 1954, Mr. Ogg wrote to Mrs. Arnold's Maryland counsel that William and Marlou Stogsdill were anxious to adopt Rebecca. Although not disclosed in the letter, William and Marlou had already filed an adoption petition on October 14, 1954.

On November 17, 1954, Mrs. Arnold (hereinafter referred to as respondent) entered the proceedings by filing a petition for appointment of herself as guardian of Rebecca's person and estate. On November 26, 1954, respondent filed a notice of motion to vacate the order appointing Mrs. Stogsdill as guardian upon the grounds, among others, that (1) the appointment was obtained without notice to Edna Gonzales; (2) there were misrepresentations in the petition for appointment; (3) that Mrs. Stogsdill's appointment was contrary to Helen Levy's wishes; (4) that respondent was induced not to seek the guardianship by false representations; (5) that respondent was led to believe no guardianship had been petitioned for by Mrs. Stogsdill, and (6) respondent was led to believe that if a guardianship was sought by and granted to Mrs. Stogsdill it would be of temporary status for the purpose of administering the estate of Helen Levy.

The hearing on respondent's petition for appointment as guardian, and upon the motion to vacate the order appointing Mrs. Stogsdill, was held on January 12, 1955. In the proceedings which followed, the court set aside the appointment of Mrs. Stogsdill on January 14, 1955, "for the purpose of hearing the Petitions for appointment of Guardians [being the petition of Marian and the petition of Lula under which she had previously been appointed]." On January 17, 1955, in the course of the hearings on the respective petitions of respondent and Mrs. Stogsdill, the latter's son, William, filed his own petition for appointment as Rebecca's guardian. On January 19, the petitions of Mrs. Stogsdill and William

(hereinafter sometimes denominated appellants) were denied, while respondent's petition was granted and letters of guardianship were issued to her. On the following day, the court amended its order of January 19, 1955, by ordering appellants to deliver Rebecca forthwith to respondent. On the same day, Mrs. Stogsdill filed a notice of appeal from the order of January 19 revoking her letters of guardianship and appointing respondent and ordering custody of Rebecca to be given to respondent.

On January 24, 1955, upon application by respondent, a writ of habeas corpus was issued commanding appellants and Marlou Stogsdill to bring Rebecca before the court. In view of the pendency of the appeal, the District Court of Appeal issued a writ of prohibition restraining the court from proceeding under the writ of habeas corpus to enforce its order directing the delivery of the child to its new guardian. (*Stogsdill* v. *Superior Court*, 131 Cal.App.2d 78 [280 P.2d 148].) On February 4, 1955, the trial judge signed and filed findings of fact, conclusions of law and a judgment in the matters of the three petitions for letters of guardianship and in the matter of the motion to vacate the order of July 27, 1954, appointing Mrs. Stogsdill as guardian. The judgments were in conformity with the minute orders previously described relative to these matters.

On February 28, 1955, appellants filed a supplemental notice of appeal to cover these additional judgments and order.

Appellants contend that respondent was not a party against whom any judgment or order was taken within the meaning of section 473 of the Code of Civil Procedure. There is no merit in this contention. As she was privileged to do in a guardianship proceeding, wherein the appointing court retains continuing jurisdiction of the guardianship by virtue of the solicitude of the state, as *parens patriae*, for the welfare of the ward (*Guardianship of Reynolds*, 60 Cal.App.2d 669, 673 [141 P.2d 498] ; 24 Cal.Jur.2d p. 376, § 195), respondent filed her own petition for appointment as guardian within four months after Mrs. Stogsdill's appointment and thereby became a party to the proceedings. A week later, and within the six months' period prescribed by section 473, she filed her notice of motion to vacate the order appointing Mrs. Stogsdill. Respondent relied not only upon the grounds of her mistake, inadvertence and excusable neglect but also alleged the said order of appointment was procured by affirmative falsification and the concealment of information from

the court. Having on file her own petition for appointment as one asserting a superior right to be appointed guardian and one who was consequently injuriously affected by the prior order, respondent was clearly a party against whom the order was taken within the meaning and intent of section 473 as it applies to guardianship proceedings. (*In re Pozzo,* 120 Cal.App. 721 [8 P.2d 217].) In the Pozzo case, one Frank Pozzo was appointed guardian of two incompetents on August 17, 1928. On September 18, 1928, Carmen Pozzo (the respondent) filed a petition for appointment as guardian and a notice of motion supported by affidavits to set aside the order appointing Frank (*In re Pozzo,* 104 Cal.App. 11, 12 [285 P.2d 330]). On January 22, 1929, she filed a new notice of motion under section 473 to set aside the order appointing Frank. Out of this basic situation, which corresponds to the procedure in the case at bar, various proceedings were had in connection with orders made by the trial court setting aside Frank's appointment. At all times, respondent's original petition seeking her appointment remained on file. As in the case at bar, Frank contended that respondent "was not a party to the proceeding in which he was appointed guardian so as to be entitled to move under Code of Civil Procedure, section 473, to have the order appointing him set aside. ▮ In answering this contention, the court stated ". . . we do not hesitate to decide that one who opposes the appointment of another as a guardian and seeks the appointment for herself, as respondent did in this case, is an adverse party entitled to seek relief under Code of Civil Procedure section 473." (P. 726.) That declares the rule here applicable.

But exploring the subject somewhat further, it is pertinent to point out that respondent's motion was made on much broader grounds that those stated in section 473. Her notice specified not only inadvertence and excusable neglect, but that the judgment was fraudulent in that Mrs. Stogsdill misrepresented her relationship to the minor and failed to reveal that the minor's aunt, Edna Gonzales, resided in California. Under such circumstances, the court properly entertained respondent's motion, "and the granting thereof was the equivalent of an order making . . . [her] a party to said action." (*Nuckolls* v. *Bank of California,* 10 Cal.2d 266, 273 [74 P.2d 264, 114 A.L.R. 708].) ▮ Intrinsic fraud perpetrated upon the court is well recognized as a ground for relief under section 473 where, as here, the motion is

made within the period of time prescribed by that section. (*Rice* v. *Rice*, 93 Cal.App.2d 646, 651 [209 P.2d 662]; *Security-First Nat. Bank* v. *Hauer*, 47 Cal.App.2d 302, 307 [117 P.2d 952]; *Tomb* v. *Tomb*, 120 Cal.App. 438, 441 [7 P.2d 1104]; *In re Johnson*, 7 Cal.App. 436, 439 [94 P. 592].) ██ As remarked in the case last cited: "In applications for relief under section 473 of the Code of Civil Procedure, made within a reasonable time, no distinction is to be made between extrinsic or other fraud. Fraud *or its equivalent, whether upon the court* or a party or *one so situated as to be held in law an adversary,* is sufficient to warrant relief." (Emphasis added.) ██ In the case *sub judice,* the court was clearly imposed upon by Mrs. Stogsdill both in her petition and in her testimony at the ex parte application. Good faith on her part required that she inform the court that she was not, as she represented, Rebecca's aunt, but her great aunt. Fairness to the court also required that she set out that Mrs. Gonzales, an aunt of the minor, resided in Los Angeles County so that the court might decide whether notice to her of the proceedings was desirable (Prob. Code, § 1441). When respondent's motion suggested to the court that the proceeding resulting in its prior order was tainted with this type of irregularity, and when its investigation into the integrity of its records revealed that it had been imposed upon, it had the power under the circumstances to grant respondent's motion and set aside the order appointing Mrs. Stogsdill as guardian. Such control by the court over its proceedings is especially vital in a guardianship proceeding, since the guardian acts as an arm or officer of the court (*Guardianship of Reynolds,* 60 Cal.App.2d 669, 674 [141 P.2d 498]; 24 Cal.Jur.2d § 11). It would be especially unfortunate if it could not strike down such an appointment procured through misrepresentation and concealment of material facts. From the foregoing, it is clear that the court properly invoked its power under section 473 to set aside the order appointing Mrs. Stogsdill as one procured under circumstances equivalent to a fraud upon the court.

██ There was equal reason to set it aside upon respondent's motion made on the grounds that it was taken as a result of her inadvertence and excusable neglect. In the correspondence passing between the parties the impression was created that Mrs. Stogsdill's guardianship was primarily for the purpose of administering the estate of Helen Levy and keeping the expense thereof at a minimum, and that it

could be "terminated after Helen's estate is closed"; that the appointment could be revoked by the court "at any time." The letters written on behalf of Mrs. Stogsdill were equivocal and failed to reveal the fact that even while permission was being sought by Mrs. Stogsdill to become guardian she had in fact already filed her petition and a hearing date had been set. Her counsel also assured Mr. Weigle that letters of guardianship could be revoked by the court at any time, but he failed to mention that a guardian could only be removed for statutory cause. The trial court could reasonably draw the inference that the whole tenor of the correspondence showed a design to throw the eastern relatives off guard as to Mrs. Stogsdill's underlying purpose in procuring a permanent guardianship over Rebecca and to present them with a *fait accompli* which would defeat respondent's avowed intention either to adopt Rebecca or become her guardian. There was thus also substantial reason, based on respondent's inadvertence and excusable neglect, for setting aside the ex parte order and proceeding with a hearing on the merits. In view of the multifarious authorities stressing the remedial nature of section 473 and that the power under that section should be liberally invoked to dispose of cases on their merits, we cannot say the court abused the dictates of sound discretion in setting aside Mrs. Stogsdill's appointment. (*Proulx* v. *De Moti,* 106 Cal.App.2d 265, 269 [234 P.2d 1009] ; *Nuckolls* v. *Bank of California,* 10 Cal.2d 266, 273 [74 P.2d 264, 114 A.L.R. 708].)

Appellants contend that the appointment of a nonresident as guardian of the person and estate of a minor is contrary to California law. This argument is clearly untenable. Appellants concede that there is no statutory requirement that the guardian be a resident of this state but argue that "there are other pertinent provisions of the Probate Code which appear to show what the law of this state would be were the question presented, as is the case in this instance." They rely on section 420 of the Probate Code which requires that administrators of estates be bona fide residents of this state and section 1606 of the Probate Code which states: "When not otherwise specially provided in this division, *practice and procedure* and the *making and entry of orders* under this division shall be governed by the provisions . . . of this code, so far as they are applicable." (Emphasis added.) An attempt upon the same grounds to defeat the appointment of a nonresident guardian of the estate of an incom-

petent person by applying the substantive statutory law relating to administrators was made in the case of *Guardianship of Boutz,* 24 Cal.App.2d 644, 646 [76 P.2d 154], where the court states (p. 648): "By virtue of section 1606 of the Probate Code, appellant also attempts to read into the provisions of the Probate Code, referring to the guardianship of insane persons, the provisions of the code relative to the appointment of . . . administrators, but such section cannot be applied here as that section applies to matters of procedure only."

The Boutz case rests upon wholesome principles. Had the Legislature decided to exclude nonresidents from securing appointments as guardians of a minor, it would have specifically so stated as was done in the case of administrators. But it did not do so for very cogent and compelling reasons, because of the crucial distinction between the duties and functions of an administrator and a guardian. ■ An administrator is interested primarily in winding up the estate of an intestate. ■ The cardinal consideration governing the court in its appointment of a guardian for the person and estate of a minor is how to serve most effectively the best interests and temporal, moral, and mental welfare of the child. (*Guardianship of Aviles,* 133 Cal.App.2d 277, 281 [284 P.2d 176]; *Guardianship of Walsh,* 100 Cal.App.2d 194, 196 [223 P.2d 322, 22 A.L.R.2d 689].) A wide latitude must be allowed the trial judge in the exercise of the discretion vested in him, so that he may perform his statutory duty in a manner most conducive to the permanent well-being of the child. It may sometimes be for the best interests of the child that a nonresident should be appointed, either as one most closely related to it, or as one highly qualified to act and nominated by the deceased parents, or as one best able to educate and support the child, or for any other significant advantage that might accrue to the child. ■ For such reasons the Legislature has seen fit not to interpose any statutory abridgment of the court's power to designate a nonresident as guardian if such appointment would promote the welfare and best interest of the child. In *Guardianship of Boutz, supra,* (p. 647), in summarizing the authorities, the court pointed out that while in many instances a resident guardian might be preferred as a matter of policy, yet "in the absence of a specific statutory bar the courts of this state have the power to appoint a nonresident guardian. . . ." This is a salutary rule. While the place of residence of the

prospective guardian is not to be ignored, the mere fact that he is a nonresident cannot inhibit the court from appointing him when the circumstances are such as, in the court's discretion, make it appear for the best interests of the minor to do so.

Appellants also argue that since section 1580, subdivision (6), of the Probate Code enables the court to remove a guardian ''for removal from the state,'' there is the suggestion of a statutory intent that only a resident should be appointed.

The removal of a guardian for any of the reasons specified in Probate Code, section 1580, rests within the broad discretion of the court. (*Estate of Howard,* 133 Cal.App.2d 535, 741 [284 P.2d 966] ; *Guardianship of Riley,* 72 Cal.App. 2d 742, 747 [165 P.2d 555].) In *Guardianship of Boutz, supra,* the court observed that the mere fact that a guardian might be subject to removal if he departed from the state did not militate against the appointment of a nonresident guardian. The reason, of course, is clear since the court itself is authorized to allow the guardian and his ward to take up residence outside the state. (Prob. Code, § 1500; *Ricci* v. *Superior Court,* 107 Cal.App. 395 [290 P. 517].) The last sentence of section 1500 reads: ''The guardian of the person of a ward may fix the residence of the ward at any place in the state, but not elsewhere without the permission of the court.'' This section not only inferentially recognizes the possibility that a nonresident or one proposing to leave the state may be appointed guardian, but authorizes the probate court to make an order fixing the residence of the minor in the place outside the state to which the guardian wishes to remove himself. (*Ricci* v. *Superior Court, supra,* p. 398.)

Appellants contend that it was an abuse of discretion to appoint a nonresident in the absence of any clear and strong reason therefor. We do not agree. Respondent was Rebecca's maternal aunt, while Mrs. Stogsdill was a great aunt and William Stogsdill a cousin. While the evidence was conflicting as to whom the deceased mother preferred, Mrs. Gonzales testified that Helen Levy told her in December, 1953, that ''If anything happens to me I want Marian and Carl to have my baby.'' About a month before her death, Mrs. Gonzales testified her sister again said: ''Marian and Carl will take my baby if anything happens to me, Edna.'' Respondent testified her sister had written to her to the same effect. Probate Code, section 1407, provides: ''Of persons

equally entitled in other respects to the guardianship of a minor, preference is to be given as follows: (1) To a parent; (2) To one who was indicated by the wishes of a deceased parent; . . . (4) To a relative. . . .'' Respondent being more closely related by consanguinity, there being evidence that her deceased sister expressed a desire that she have the child, and other evidence showing that respondent was a fit and responsible person, maintained a good home, and had a daughter about three years older than Rebecca, we cannot say that there were no compelling reasons for the appointment of respondent in preference to appellants or that it was an abuse of discretion to do so. While appellants are unquestionably also estimable people, the ultimate selection of the trial court, guided by the polar star of what is for the best interest of the child, cannot be disturbed in the absence of a showing of abuse of discretion. (*Guardianship of Walsh*, 100 Cal.App.2d 194, 196 [223 P.2d 322, 22 A.L.R.2d 689]; *Guardianship of Sharp*, 41 Cal.App.2d 79, 84-85 [106 P.2d 244].) To fetter the court's discretion by virtue of geography alone would frequently doom rather than advance the welfare of the child.

 Appellants complain that over their objections the court permitted the introduction of oral testimony regarding the contents of letters written by Helen Levy to respondent in which the deceased mother expressed her wishes concerning the placement of her child. Such testimony is admissible in a guardianship proceeding wherein much latitude must be allowed in clarifying facts relevant to the child's best interests and welfare. Appellants contend there was no proper foundation to permit oral evidence of the contents of the letters. Sections 1855 and 1937 of the Code of Civil Procedure permit such evidence of the contents of a writing when the original has been lost or destroyed. Preliminary proof of the loss or destruction is required and it is committed to the trial court's discretion to determine whether the evidence so offered is or is not sufficient. (*Kenniff* v. *Caulfield*, 140 Cal. 34, 41 [73 P. 803]; *White* v. *White*, 39 Cal.App.2d 57, 60 [102 P.2d 432].) Respondent testified that the letters in question were received by her while she was in the Philippine Islands, where her husband was on military duty. She destroyed all letters she had received, including those from her sister, preparatory to returning to the United States, because of baggage limitations. The court stated it was satisfied with her explanation of the destruction

of the letters. ▮▮▮ The rule is well established that the determination of the trial judge that substantial evidence has been introduced to show the loss or destruction of a writing as a prelude to the reception of testimony as to its contents will not be disturbed on appeal where no clear abuse of discretion appears. (*Hausen* v. *Goldman*, 124 Cal. App.2d 25, 30 [267 P.2d 852]; *White* v. *White, supra*; *Kenniff* v. *Caulfield, supra*; *Cotton* v. *Hudson*, 42 Cal.App.2d 812, 814, 815 [110 P.2d 70].) The record fails to show an abuse of discretion.

Appellants contend it was error to exclude evidence concerning the character of derogatory remarks allegedly made by Bertie Miller concerning Raymond Levy, Rebecca's father, since Mrs. Miller was living in respondent's home. It is asserted Mrs. Miller was biased against Mr. Levy because of his religion. The complaint is also made that certain evidence of friction between Mrs. Miller and Mr. Levy was excluded. However, Mrs. Miller was not a party to this proceeding and her attitude toward the child's deceased father did not bear significantly on the issues in the case. It is not contended that respondent entertained religious prejudice that would adversely affect her capacity to serve as guardian. Furthermore, the court did receive evidence from both Mrs. Stogsdill and her husband bearing on Mrs. Miller's purported bias and also that there was friction between Mrs. Miller and Mr. Levy. Other witnesses, such as Mrs. Phelan, Catherine Ryan and Emma Miller also testified to friction between the Levys and Mrs. Miller and respondent. It is thus clear that the evidence excluded was merely cumulative. ▮▮▮ Where independent evidence from other witnesses to substantially the same effect as the excluded evidence is placed before the trier of facts, the erroneous exclusion of such cumulative or repetitious evidence is ordinarily nonprejudicial. (*Ash* v. *Soo Sing Lung*, 177 Cal. 356, 360 [170 P. 843]; *Battle* v. *Niece*, 43 Cal.App.2d 655, 659 [111 P.2d 455]; *Fuller* v. *Vista Del Arroyo Hotel*, 42 Cal.App.2d 400, 405 [108 P.2d 920]; *Vuilleumier* v. *Kelley*, 117 Cal.App. 723, 731 [4 P.2d 557].) This is such a case.

The judgments and order are affirmed.

McComb, Acting P. J., concurred.

Ashburn, J. pro tem.,* concurred in the judgment.

---

*Assigned by Chairman of Judicial Council.