[Civ. No. 32940.   Second Dist., Div. One.   Apr. 10, 1969.]

M. P. ROBINSON, Plaintiff and Respondent, v. WILLIAM
J. THORNTON, Defendant and Appellant.

Lewis B. Kean for Defendant and Appellant.

Edward J. Skelly for Plaintiff and Respondent.

LILLIE, J.—Plaintiff sued for damages for defendant's breach of a written agreement to repurchase from plaintiff for $5,000 all of his right, title and interest in a certain natural gas lease in New Mexico, specific performance of the contract and $5,000 on a promissory note executed by defendant in plaintiff's favor. The matter was heard by the court sitting without a jury. Judgment was entered in favor of plaintiff and against defendant in the sum of $5,000 together with interest and costs. Defendant appeals from the judgment.

In 1960 plaintiff, an attorney at law, who had never before invested in a gas or oil well, and defendant, a licensed California stockbroker, salesman, had a conversation about gas leases. Defendant told him he had been investing in gas leases or gas wells in the San Juan area in New Mexico, knew the son of the developer, had opportunities to invest and had clients who invested with him in gas wells; that "it was like shooting fish in a barrel" for there just weren't any dry wells in the San Juan region, and after a well is developed and sold the returns are from three to six times the investment. Later after several conversations, defendant went to plaintiff's home where he explained that the promoters permit him and his friends to invest, usually in "$15,000 chunks" and he could make one available to plaintiff for $15,000. When plaintiff told him he did not have $15,000, defendant said that maybe they would accept less if he (defendant) could get additional money elsewhere. Subsequently defendant called and said if he could afford $5,000 he could get into the deal, they were expecting a good well, "It's a sure thing." Soon thereafter defendant came to plaintiff's home and showed him a map of the region. Plaintiff said he didn't want any doubts about the investment; defendant told him he was so confident, so sure of it, he would guarantee the $5,000 in writing, and brought to plaintiff a handwritten "dry hole guarantee" he had prepared. Later plaintiff told defendant he did not like the form of the document, and "then discussed

it some more. And out of that we both then agreed that he would buy my interest back for $5,000 at any time after six months if I made demand for it. In return for that, I would extend to him an option to buy my interest, whether I wanted to sell it or not, for $15,000 at any time within twelve months. And based upon that oral agreement I then drew a written document . . . one for me and one for him.'' Thereafter on February 21, 1961, in plaintiff's office, plaintiff handed to defendant (he may then have mailed it at defendant's direction) his check for $5,000 "and at that time we both signed this agreement and he took a copy of it.'' His counsel showed plaintiff a photocopy (Exh. 1)[1] which he identified as a copy. of the copy of the agreement he had prepared and given to defendant February 21, 1961.[2]

At this point in the trial, defendant having claimed that he did not sign the agreement, the judge suggested that the issue whether the written agreement of February 21, 1961, had been executed be determined first. It developed that the original written agreement signed by defendant and retained by plaintiff was lost. According to plaintiff, after the execution of the written agreement he turned over the original to John Atchley, his attorney, who later brought the within action. Mr. Atchley and Mr. Walker (defendant's attorney) tried to settle by setting up a joint escrow and transferring certain documents but the attempt failed. In 1963 Mr. Atchley died. As to the original written agreement bearing defendant's signature, plaintiff testified, "And I don't know what Mr. Atchley did

[1] "February 21, 1961
Los Angeles, California
"FOR CONSIDERATION, I hereby promise to purchase from MARK P. ROBINSON, on demand at any time after six (6) months from the date hereof all of his right, title and interest in and to a certain natural gas lease on real property located at _____ and identified by escrow _____,
New Mexico for the sum of FIVE THOUSAND DOLLARS ($5,000.00). As part of the consideration for said agreement, Mr. Robinson, by accepting this agreement extends to me an irrevocable option to assign to me upon demand at anytime up to twelve (12) months from the date hereof all of his right, title and interest in and to the same natural gas lease for the sum of $15,000.00 payable in cash upon demand.
/s/ W.J.T.
Accepted:
/s/ Mark P. Robinson''

[2] Defendant had not produced this photocopy pursuant to any demand by plaintiff. Earlier in the litigation it had come into possession of plaintiff's counsel through service on him of defendant's notice of motion for summary judgment [subsequently denied]; it was attached as Exhibit "A" to Affidavit of William J. Thornton in Support of Motion for Summary Judgment.

with it, but when we went to his file it was not there anymore, so what he did, I don't know . . . He died, your Honor, and that is when we started looking through his things." Defendant testified, "I have my own opinion on it that I didn't sign it [original agreement]"; in his deposition he said he could not remember. However, when shown his photocopy (Exh. 1) which bears plaintiff's signature and his own initials, "W.J.T.," defendant admitted that the initials "appear" to have been made by him and that it was a photocopy of the onionskin copy plaintiff prepared and gave to him and which he later gave to his attorney Mr. Walker. Mr. Walker also died and the onionskin copy too disappeared; thus both the original written agreement and defendant's original copy have been lost. Then defendant was confronted with two affidavits executed by him (October 27, 1965, and February 18, 1966) and filed in support of his motion for summary judgment, in each of which he stated under oath: "That on February 21, 1961, your affiant [defendant] and plaintiff executed a certain document a copy of which is attached hereto and marked Exhibit 'A'. . . ."[3] Having heard all of the evidence in this connection, the trial court ruled that defendant "did execute the original agreement" retained by plaintiff and that neither the original agreement nor the orginal copy is any longer in existence. Ultimately the trial court found that plaintiff and defendant entered into an agreement in writing dated February 21, 1961 (Finding I); there is no question but that this finding is supported by the evidence.

The trial continued and, relying upon the photocopy (Exh. 1) of his copy which contains neither his signature nor the legal description in the blanks provided therefor and which he kept in his possession, defendant raised the issue that "the document is entirely at law insufficient . . . there is no description here, absolutely none." (§ 1624, subd. 4, Civ. Code.) However, the evidence received without objection, establishes that as part of the transaction and at the time plaintiff gave his $5,000 check to defendant and they signed the written agreement, they discussed the fact that no legal description was then available and the impossibility of filling in the blanks therefor at that time, and orally agreed that when the legal description became available each could fill in

---

[3]It further appears that Mr. Walker prepared and filed an answer to plaintiff's complaint in which there was no denial of the execution of the written agreement, the basis of plaintiff's suit.

his copy;[4] that subsequently plaintiff did receive the legal description and pursuant to their oral contract the description[5] was inserted in the original agreement then in the possession of plaintiff's counsel;[6] and that although the legal description also became available to defendant, defendant failed to enter the same on his copy. (Exh. 1.) Relying upon the incomplete photocopy (Exh. 1), defense counsel did not question defendant concerning this, thus the court asked defendant if he had discussed with plaintiff the absence of a description and whether this would be filled in later, but defendant evaded answering the question and talked about his unexecuted handwritten "dry hole agreement."

Appellant challenges the findings "that the legal description was inserted on the original of said agreement" (VIII) which "is a sufficient agreement in writing, as required

---

[4] "Q. [plaintiff's counsel] And was there anything said about any legal description of what you were purchasing from Mr. Thornton, between you and Mr. Thornton?

"A. [plaintiff] I don't recall the exact words, but basically it was agreed, or we discussed the substance of the fact that there was no way to fill in a description at the time because we didn't have the legal description and that we would leave it blank and that either of us could fill it in when we found out the description."

[5] In plaintiff's first amended complaint it was alleged that said description did become available in 1961 and is as follows:
"*Township 31 North, Range 12 West, N.M.P.M.*
Section 35: W/2 SE/, containing 80 acres more or less and which lease is subject to royalties and overriding royalties in the amount of 30%, and
*Township 31 North, Range 12 East, N.M.P.M.*
Section 35: W/ SE/4, containing 80 acres more or less and extends to and includes only the Dakota formation underlying said lands and the natural gas produceable from such formation."

[6] "Q. [by the court] I believe you testified yesterday, I'm not sure how you put it, but you knew or felt or had reason to believe that Mr. Atchley, your attorney, Mr. Atchley had filled in the legal description on your copy, the original of Exhibit 1? Do you remember?

"A. [plaintiff] I think I said that I couldn't swear to it but I believed he did. . . . I don't think I can give you anything specific. It's just the general belief that I had, when I took the agreement for the purpose of drawing the complaint, I assumed that he was going to either attach a copy of the agreement to the complaint or that he would set it out in, you know, in the complaint, at least describe it and would set forth the legal description. And other than that I can't say that I ever saw him do it or that he even told me that he did.

"Q. Did you give him the legal description when you turned the agreement over to him?

"A. Yes, he had the legal description.

"Q. And did you tell him of your discussion with Mr. Thornton with respect to filling in the description later?

"A. I could not honestly say that I remember that specific item as distinguished from everything else. But I did have a pretty good lengthy conversation with him about the whole transaction and I would say that I would have included that in my discussion."

by section 1624(4) of the Civil Code" (XV). ■ Designating the interest set up in the written agreement as an "interest in real property," appellant, still relying on his own copy in which he did not insert the legal description, argues that the lack of description therein is fatal (§ 1624, subd. 4, Civ. Code), parol evidence cannot "supply the required description which the parties have failed to insert," and the only agreement presented to the court (photocopy of defendant's copy) contains no description whatsoever.

■ When a finding is attacked on the ground the evidence is not sufficient to support it, the power of this court begins and ends with the determination as to whether there is any substantial evidence contradictory or uncontradictory which will support the finding of fact. (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231]; *Treadwell* v. *Nickel,* 194 Cal. 243, 260 [228 P. 25].) ■ Moreover, such contention requires appellant to demonstrate that there is no substantial evidence to support the challenged finding. (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550].) ■ Thus, with these rules in mind, comparing the findings with all of the evidence in the case and construing them liberally in support of the judgment (*Mashon* v. *Haddock,* 190 Cal.App.2d 151, 167 [11 Cal.Rptr. 865]), and viewing the evidence and indulging all reasonable inferences therefrom most strongly in favor of the findings and judgment (*Grainger* v. *Antoyan,* 48 Cal.2d 805, 807 [313 P.2d 848]; *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]), we can only conclude that the record contains ample evidence in support thereof.

First, the record shows that the photocopy of defendant's incomplete copy of the agreement which lacks both his signature and the legal description (Exh. 1), upon which he relies, is neither "the only agreement presented to the court" below as asserted by appellant, nor the agreement relied on and proved by plaintiff. The written agreement on which plaintiff predicated his case was the original which contained defendant's signature and the legal description. ■ Second, appellant misconceives the purpose for which the parol evidence was received. It was not offered to vary the original written agreement or to supply a legal description which it did not include, but to prove the contents of the lost document. Preliminarily and without objection, plaintiff offered proof of the loss or destruction of the original written agreement. Exercising its discretion (*Kenniff* v. *Caulfield,* 140 Cal. 34, 42 [73 P. 803]) the trial court determined the proof to be

sufficient and ruled that the original written agreement was no longer in existence. Defendant did not and does not here question the ruling. Having found the original instrument to have been lost, it was proper for the court to receive parol evidence as to its content. (§ 1501, Evid. Code; *Guardianship of Levy*, 137 Cal.App.2d 237, 249 [290 P.2d 320].) Accordingly, without objection thereto, plaintiff proceeded to establish the contents of the original written agreement; obviously the trial court gave credence to plaintiff's testimony.

At no time did defendant deny under oath that at the time they signed the agreement and plaintiff paid the $5,000 they discussed the unavailability of the legal description and orally agreed that when each received the same he could fill in the blanks on his own copy; and no evidence that the original written agreement did not contain the legal description was received. Thus, the judge inquired of defendant concerning this but received no responsive answer.[7] Suspecting that defendant knew that a legal description was necessary for a valid agreement and that he intentionally submitted for plaintiff's signature the "dry hole agreement" containing none, the judge asked further questions.[8] However, it is apparent from the evidence that, while he may have had no legal description at the time of the execution of the written agreement, defendant did have a map of the San Juan

---

[7] "Q. [by the court] Did you discuss with him [plaintiff] the absence of the description and whether or not this would be filled in later?

"A. Well, in my [hand]written statement [which defendant concedes was never executed] there was no blank lines left like in his. It was just a statement, 'This is a dry hole agreement'. The words would be to the extent if at such time you invest money in a dry well, I mean in a well which is a dry hole I—I am not sure whether Mr. Dial or my own name was used in there, but it was at Mr. Dial's knowledge I did this. But no description was spelled out. Mine was a handwritten document, sir."

[8] The court to defendant: "Q. You felt or believed this could be a legal agreement on your part to reimburse him or to repay him if there was such a dry hole in any well that he purchased an interest in?

"A. I never got a legal opinion on—

"Q. I am asking you for your belief? Did you believe you were giving him a legal agreement?

"A. I have no way of knowing. I gave him what he asked for.

"Q. I am talking about the dry hole agreement. You had that prepared?

"A. No, I did that myself.

"Q. Did you believe you were giving him a legal agreement that required you to do what it said in there that you are bound to do it? Did you believe that you were, when you gave it to him or did you think you were just giving a phony piece of paper?

"A. I didn't believe either. When he asked for an agreement, I thought I was giving him, I was complying with his request. I didn't believe either. Your Honor, this was originally supposedly based on a friendship. It was not intended to be a legal ramification."

region showing "the tract, range and township relative to this amount of property" which he brought to plaintiff's home, and subsequent thereto had the legal description although he did not, under the oral agreement, insert the same in his copy. Defendant's entire testimony reflects a reluctance to be forthright in his version of what occurred and to assume any responsibility for his acts. In many areas he was vague and indefinite and frequently resorted to lack of memory; in major matters his testimony was inconsistent and evasive. At some points he denied having anything at all to do with plaintiff's investment except "conversationalwise is all," or knowing about it; several times he claimed that others (Dial or Noel) dealt with plaintiff and they knew more about it, and all he knew was what he read in the complaint. The foregoing, the fact that plaintiff, a practicing attorney, obviously knew the necessity for compliance with the requirements of section 1624 subdivision 4, Civil Code and plaintiff's direct testimony support the findings. ■ Plaintiff having paid the $5,000 and executed the written agreement of February 21, 1961, in reliance on the oral contract that later each could insert the legal description in his copy, and through his attorney the oral contract having been completely executed on his side, defendant cannot take advantage of his own failure to fill in the blanks in his copy by relying upon his incomplete copy to invoke the statute of frauds in this action for his breach of the written agreement.

It is unnecessary to determine whether plaintiff's transaction amounted to participation in a pooling agreement.[9] The written agreement provides for the purchase by defendant from plaintiff of "all of his right, title and interest in and to a certain natural gas lease," but it is apparent from the evidence that others including defendant invested in the gas lease or well. Defendant himself had invested $18,000 in the

[9] On cross-examination plaintiff was asked: "In other words, as I understand it, you purchased some leases which are the subject of this litigation. Did you ever pay for them by giving Mr. Thornton a check?

"A. First of all let me correct you. If I left you the impression that I purchased some leases, I didn't mean to say that. At no time have I understood that I purchased any leases. It was my understanding that I was investing in a group through Mr. Thornton and that some portion of the lease would bear my name as a security. I never intended or thought that I was buying any leases from anybody." Asked if it was his understanding that he was buying an undivided interest in some leases or a lease plaintiff answered: "It was my understanding that I was going into a pool and that when the time came for distribution, in order to protect each person who was investing, that some undivided interest in the total lease would bear my name."

area over the past two years and was paid by the promoters to interest others. Originally defendant offered plaintiff a $15,000 "chunk" but later took his $5,000 and made up the $10,000 from other investors which may well have included himself. Defendant admitted that there were 320 acres to the well in which plaintiff invested and that he invested therein.

Within the six-month period plaintiff, under the written agreement of February 21, 1961, made several demands on defendant to purchase his interest for $5,000; after his last demand plaintiff filed the within lawsuit but did not serve it; when defendant ignored the demand, plaintiff attached certain of defendant's property. Defendant then told plaintiff he would arrange to pay the $5,000 if he would hold up further proceedings for a while, that it would be expensive for him to defend the action, take depositions and hire attorneys; "his point was if we just hold everything up for 60 days that he would pay us the money. . . ." Plaintiff testified he told defendant "that I would take the promissory note, not in payment of the obligation, but just in evidence of his good faith and would hold up all other proceedings for a while and that I would have the right to proceed on either the note or the original agreement if, in fact, he did not pay. He agreed" and gave plaintiff his promissory note dated January 15, 1963, for $5,000 payable on or before March 16, 1963. Plaintiff further testified, "I was not to do anything or pursue it [action] in any way and I was to give him 60 days to get the money together." During the 60-day period plaintiff made no demand on defendant and did not in any manner proceed with the lawsuit. However, counsel made an effort "towards winding the whole thing up" whereby defendant was to pay plaintiff $5,000 and plaintiff would waive interest and give an assignment and general release, but the effort failed because around March 16, 1963, on behalf of defendant, Dial gave plaintiff his check for $5,000; it "was put through and it bounced." On the other hand, defendant testifying concerning the promissory note admitted that he executed the note and did not pay it, explained the circumstances under which he signed it, the purpose for which it was given—"to keep Mr. Robinson from going to the district attorney"—and the consideration therefor—"I got peace of mind."

The trial court found "that the promissory note set forth was a valid, binding, legal agreement, and was not executed by the defendant Thornton conditionally to attempt to settle a

lawsuit, but was executed with the full expressed intention that defendant Thornton would be bound by the said promissory note, and pay plaintiff the sum of $5,000, as provided in said note." (Finding IV.) While it is true that counsel took advantage of the 60 days and sought to settle the matter, defendant's promissory note was given specifically in exchange for time in which to get the money together and for peace of mind and plaintiff's promise that during the 60 days he would proceed no further with his action. This forbearance was sufficient to constitute a good and valuable and independent consideration to support the note (*Brody* v. *Gabriel,* 193 Cal.App.2d 644, 645 [14 Cal.Rptr. 539]), although, of course, there was an obvious benefit running to defendant.

At the conclusion of the trial the judge called the attention of counsel to the failure of the pre-trial order to specifically mention the issue of nonpayment of the promissory note alleged in plaintiff's fourth cause of action and said, "If you want to make a motion to amend the pre-trial to include the issues raised by the fourth cause of action . . . and the answer thereto, you can do that"; plaintiff so moved and the motion was granted. Appellant claims this was error.

Trial courts have the discretion to allow oral amendments to pre-trial orders at any time during the trial provided the adverse party is not prejudiced thereby. (*Gonzales* v. *Brennan,* 238 Cal.App.2d 69, 74-75 [47 Cal.Rptr. 501]; *Universal Underwriters Ins. Co.* v. *Superior Court,* 250 Cal.App. 2d 722, 727 [58 Cal.Rptr. 870].) Plaintiff pleaded the execution of the promissory note, demand and defendant's failure to pay it in his fourth cause of action (par. VI, VII). While appellant now asserts that plaintiff's fourth cause of action was not sufficient to set up a cause of action on the note, he neither demurred to it nor moved to strike but admitted the note's execution and tendered the issue of its consideration and payment in paragraph 14[10] of his answer by setting up a further and separate defense to the fourth cause of action. This case was tried on the basis that the issue was properly raised and without objection plaintiff testified to the execution of the note, the consideration given therefor and

[10] "That the note was executed approximately five months after the filing of the Answer to the original complaint, and said note was executed in connection with efforts on the part of the defendant's then counsel to settle the pending litigation, and that plaintiff knew full well and still knows that said promissory note was executed in connection with these efforts to settle the litigation, which proved fruiless, and for no other purpose whatsoever."

defendant's failure to pay it; defense counsel then cross-examined plaintiff on these matters; and defendant testified that he executed the note and failed to pay it and explained the circumstances surrounding its execution and the purpose for which it was given. The entire issue was fully tried. There was no element of surprise, and it is not true, as appellant now asserts, that he was not permitted to raise the defense of lack of consideration. Among other questions concerning consideration, defendant's own counsel asked him, "Did you receive any consideration for giving a promissory note?" and defendant answered, "Yes. I got peace of mind. . . ." The issue of consideration was fully developed during the course of the trial. We find in the record no prejudice to defendant resulting from amendment of the pre-trial order to conform to proof, and there is manifest no abuse of the trial court's discretion in allowing the oral amendment.

The judgment is affirmed.

Fourt, Acting P. J., and Thompson, J., concurred.