[Civ. Nos. 10397, 10507. Third Dist. Nov. 9, 1962.]

ALVERA M. ALDABE, Plaintiff and Appellant, v. CHARLES D. ALDABE, Defendant and Respondent.

(Two Cases.)

456

Charles W. Luther, Landis & Martin and Thomas W. Martin for Plaintiff and Appellant.

Wilke, Fleury & Sapunor and Sherman C. Wilke for Defendant and Respondent.

PIERCE, J.—Two appeals by the wife in this divorce action, one from an order terminating a temporary alimony and child support order and the other from a judgment dismissing the divorce action, have been consolidated, by stipulation. Both involve the same evidence and questions of law.

On November 9, 1959 plaintiff-appellant (hereinafter "Alvera") filed her complaint in divorce in Sierra County, California, through attorney Gordon I. Smith, alleging that she was a resident of said county and state, that her husband defendant-respondent (hereinafter "Charles") had been guilty of extreme cruelty, that the community property included a ranch located partly in Sierra County and partly in Washoe County, Nevada, livestock thereon, equipment, corporate shares and bank deposits. (Aggregate value of the community property is not set forth in the complaint. In a subsequent affidavit filed Alvera fixes its value at $250,000.)

After preliminary proceedings orders were made for temporary alimony and child support in said action. In February 1960 Charles, who had not theretofore appeared, filed a motion to quash summons on the grounds: (1) that Alvera was not a resident of California when the action was filed, and, (2) that there was another action pending in the State of Nevada

between the parties based on the same cause of action. After hearing, the court, on August 17, 1960, denied the motion.

On September 19, 1960, Charles filed his answer and notice of motion to terminate temporary alimony and support based upon the fact that intermediate the order denying the motion to quash service of summons and the answer and new motion, the Nevada action had been heard, resulting in a valid Nevada decree dissolving the marriage.

The motion was heard on November 28 and 29, 1960, and resulted in the order from which this appeal was taken, which order found that the Nevada decree was entitled to full faith and credit and consequently the court terminated the previous order for temporary alimony and child support. Thereafter when the action came on for trial a stipulation was entered into that the issues be submitted on the same evidence produced at the previous hearing. The judgment appealed from followed.

 Ordinarily it would be our obligation to consider the evidence which was before the trial court subservient to the rule which resolves all conflicts in respondent's favor. Here, however, we are bound by a different rule; for we have concluded that substantial error was committed by the trial court in the sustaining of respondent's objections to certain evidence sought to be adduced by appellant and in the rejection of offers of proof (the nature of which evidence and the law applicable thereto can be more facilely stated in the discussion to follow). And in determining whether such error is prejudicial, resulting in a miscarriage of justice to require reversal (Cal. Const., art. VI, § 4½), it is our duty to examine the entire record; in effect, to some extent weigh the evidence to determine whether in our opinion "a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243] ; 3 Witkin, Cal. Procedure, Appeal, § 100, p. 2269; *Vallejo etc. R.R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 P. 238].)

Charles and Alvera were married October 5, 1941. In August 1942 they bought the Flynn Ranch. This ranch is partly in Washoe County, Nevada, and partly in Sierra County, California. *But the residence and all of the outbuildings are located in California.* During their married life together this residence has been their home and their only home at all times after its acquisition. It is where Charles still resided at the time of the hearing. There is no conflict in the evidence in this regard.

There is a conflict on the expressed desires of the spouses as to where they wished their legal residence to be.

Automobile registration had been in Nevada. In years past the parties had voted in Nevada, although in 1956 Charles' voting registration had been canceled. The parties kept a post office box in Reno as their mailing address. They shopped in Reno (much closer than any California shopping center) and banked there.

On the other hand, the Aldabes both knew that their house was in California. (They had had a survey made which had established that fact.) They paid Sierra County taxes on the portion of the ranch which is in California and on the improvements; also on household furniture and equipment in California. The joint federal income tax returns filed in 1957 showed the Aldabes to be residents of California. The 1958 returns (with no change of abode) declared them to be Nevada residents. Fire insurance policies showed them as California residents.

The Aldabes have two children, Aileen and Bertrand, ages at hearing 16 and 12 respectively. As a matter of convenience these children attended Washoe County, Nevada, schools with Sierra County, California (on the theory the parents were Sierra County residents) paying for their transportation.

During the middle fifties the parties had marital difficulties. One Robert Adams, a Reno attorney of the firm of Adams, Reed and Bowen, had long been attorney for Aldabe's family, and Alvera and Charles had both consulted him regarding their domestic problems. Alvera testified that she asked Adams to represent her in a proposed action but he told her he would not represent either because he had been the attorney for both of them. Adams, called as a witness, testified that both spouses together had consulted him regarding their problems and that he had also talked with Alvera separately; that he had told them together that he would not want to "represent either of them." Alvera testified that Adams, after she had stated her case to him, advised her that "definitely it should be in California." Adams denied this.

Alvera then sought other representation and ultimately on July 9, 1959, employed attorney Jack Streeter of Reno. No recommendation by either Charles or Adams entered into her selection. Alvera stated that she informed Streeter that her home was in California and his notes of the conference show "she lives on a ranch 17 miles north of Reno on Highway 395. Ranch was partly in California and partly in Nevada but

*the house and buildings were located in California.''* (Emphasis supplied.) Alvera also testified that Streeter told her he could bring the action in Nevada as well as he could handle it in California. When, several days later, Alvera returned to the attorney's office to verify the complaint, she testified she called attention to the allegation alleging Nevada residence, which was not true, but was told ''he'd have to put this to read like this in order to go through the courts of Nevada,'' and she thought ''well, he knows the law, if it's supposed to read that way, it's supposed to read that way.'' The daughter Aileen who was present at the time corroborated this conversation. Streeter denied it.

The complaint was filed on July 13, 1959. Charles filed an answer and counterclaim. Adams appeared as his attorney. In the original answer he alleged that the ranch was partly community and partly his separate property. In the counterclaim he alleged that both he and Alvera were residents of Washoe County, Nevada.

Alvera and her daughter, Aileen, visited Streeter in his office on October 19, 1959. A dispute arose between client and attorney. The record is not clear as to the cause of the dispute. It is clear, however, that as a result of the conversation there was a mutual agreement Streeter was no longer to represent Alvera. Alvera said she discharged him; Streeter said he withdrew.

Adams denied that Streeter advised him at that time of the termination of the attorney-client relationship, but Streeter's notes of the incident read: ''Office conference with Mrs. Aldabe on what time was spent on the case and advised her to obtain other counsel. *Telephone conference with Mr. Adams and Bowen on substitution.*'' (Emphasis supplied.) A court hearing had been scheduled in the action that day. Charles and his attorney were ready to proceed. The hearing was canceled. Appellant's theory is that Adams was ready to proceed on October 19th, that Charles was available to testify and that since the termination of Streeter's representation of Alvera was assigned as the reason for the continuance, both Adams and Charles knew this. Substantial evidence supports this contention. Both Alvera and Aileen, the daughter, testified to a conversation with Charles in which he related that Adams had told him of Streeter's discharge. Charles admitted he knew of trouble between Alvera and Streeter as the cause of the continuance but thought the information came from Alvera. A trier of facts could well have concluded that Adams knew,

as of that date, that Streeter, although the attorney of record, was no longer actively representing Alvera. And subsequent activities of both attorneys shortly thereafter lend further support to the theory.

Streeter testified he dictated pleadings to present a motion for his withdrawal as Alvera's attorney of record. The motion was never presented. Streeter asserted this was because Alvera had left the state and he could not serve her, but since the dictated pleadings were apparently never transcribed, it seems doubtful that any attempt at service was made. Alvera during this period was temporarily living in Reno (see *infra*). Adams, about this time, found no difficulty in having Alvera personally served with a restraining order in the Nevada action.

On November 9, 1959, Alvera filed the complaint in the instant proceedings in California, through Attorney Gordon Smith, having been advised by him and also (according to Alvera) by another Nevada attorney, Norman Samuelson, that since both parties were domiciled in Sierra County, California was the proper state in which to proceed.

On the same date letters were sent to Streeter, one by Smith, advising him of the filing of the California action "inasmuch as we are convinced this is her proper place of residence and she never has been a legal or bona fide resident of the State of Nevada." The other letter was by Alvera (prepared by Smith) referring to the Nevada action "in which action you have *formerly* represented me . . . and I hereby make demand upon you to immediately prepare and file a dismissal of my complaint in this action." (Emphasis supplied.)

Smith's letter to Streeter also stated: "Please address your bill for services to date in care of me for discussion with Mrs. Aldabe, and I would suggest that you carefully itemize it as I believe it will not be too well received."

Streeter testified he phoned Smith informing him he could not dismiss the Nevada action because of the counterclaim on file. Smith was not called as a witness.

The filing of the California action and the sending of the above letters were followed by these activities on the part of the Nevada lawyers:

(1) Streeter and Adams entered into a written stipulation on November 23, 1959 (without any authorization from Alvera) that $1,300 of proceeds from livestock sales being held in trust by Adams—and being claimed by Alvera as community property—be withdrawn and paid as attorneys' fees, $650 to Streeter and $650 to Adams. This stipulation was thereupon presented to the court by said attorneys and an order was

obtained and the funds so disbursed; all of this again without any authorization from Alvera; Adams made no inquiries of Streeter regarding Alvera's authorization of the fee payments. On the contrary, Streeter, according to Adams, suggested that he "felt the court should enter the order and he made a comment something to the effect I don't think she wants any attorney to be paid anything." When the stipulation was presented to the court for approval by these attorneys they withheld from the court information that Streeter had been discharged as attorney and that Alvera had not authorized payment of the fee.

(2) Contemporaneously with their stipulation regarding attorney's fees, Streeter and Adams made another stipulation that Charles' counterclaim which originally had alleged that the ranch was partly community and partly separate, could be amended to allege that all of said ranch was separate property; it was further stipulated that a reply to this amended counterclaim be made, denying the allegation of the amendment. Verification both of the amendment and of the reply were waived. This obviated the necessity of taking up the matter with Alvera and she in fact was never notified of the amendment, according to her testimony (undenied by Streeter).

(3) Ex parte proceedings were instituted by Adams to restrain Alvera from further prosecution of her California action. As a part of the foundation therefor Adams' affidavit (the sole one filed) alleged (not on information and belief) that "Charles D. Aldabe, is now, and for many years last past, has been a resident of the State of Nevada . . . ." A temporary restraining order was issued on November 12, 1959 on this affidavit. Streeter on November 23, 1959 stipulated (also without Alvera's authorization) that this and the other matters above referred to could be heard by the court two days later (November 25, 1959). Alvera was never notified of the hearing nor was any effort made to reach her. Streeter appeared in court, purporting to represent her. For some unexplained reason the temporary restraining order was dissolved. Alvera was, however, found guilty of contempt regarding child custody and, without hearing, she was deprived of the custody of her youngest child, Bertrand. By this order, both firms of attorneys were as hereinbefore mentioned allowed their fees. Alvera was never notified by either attorney of these orders.

The Nevada action was heard on April 28, 1960. Adams

gave notice of date of trial to Streeter and Norman Samuel-son. Adams stated he included the latter because Samuel-son, in a casual conversation with Adams, had indicated he might be "in the case" although afterwards Adams had found he was not. No notice of the trial was sent by Adams to Alvera and no inquiry was made by Adams to ascertain her whereabouts. Charles testified he knew where she was living at this time. No notice of trial was given to Smith by Adams. In correspondence between Adams and Smith during this period regarding the California proceeding, Adams makes no mention of the fact that he had had a date set for the Nevada trial. Streeter did not attempt to get in touch with Alvera to inform her regarding the trial date. He did notify Smith by mail and Smith phoned him stating that "Mrs. Aldabe had taken the file from his office and he didn't know what she was going to do."

Alvera testified that she never had any notice of the trial nor (until long afterward) of the decree which followed; in fact she had no notice or knowledge of any of the proceedings subsequent to Streeter's discharge as attorney and the service of the temporary restraining order shortly thereafter. She stated she thought the action had been dismissed pursuant to her letter to Streeter.

When, on April 23, 1960, the case was called for trial, Streeter appeared and his statement to the court (which respondent's brief characterizes as "a full and fair statement") was as follows:

"I represented Mrs. Aldabe and filed her complaint here some time ago, on the basis that she was a Nevada resident. We had several hearings before your Honor regarding custody of the children and certain restraining orders.

"Then she became dissatisfied with my services and conferred with three or four other local Reno attorneys, and was dissatisfied with their advice.

"She then found a sympathetic ear in California, through a California attorney, and there filed suit then on the grounds that she was a California resident.

"I have endeavored to have her appear here or at least substitute counsel for me to appear at this hearing and for the purpose of this trial, but I have been advised by her attorney that they are not going to appear here and make any effort to contest the counterclaim of the defendant.

"Therefore, I ask leave of Court to be absent during the

hearing because I am not prepared to cross-examine or present any evidence.''

No evidence before us discloses that Alvera would not appear. Also, Streeter omitted to mention that Alvera's contention of California residence was based upon the fact that she and Charles had been domiciled there for 17 years and at all times during the proceedings, that she had discharged Streeter (or that he had withdrawn) as her attorney and that the only reason he was still attorney of record was that dictated pleadings to effect such substitution had not been prepared or served. Also, contrary to his assertion to the judge, he *was* prepared to present evidence of the community status of the ranch (because he testified in the California proceeding he had been informed of the facts and was of the opinion as a result thereof that the property was community—he still believed this at the time of the hearing).

Based upon the above statement by Streeter, the court granted his request.

The case then proceeded to trial on the following evidence: One David Evans and Jack Sweeney, both neighboring ranchers, testified that Charles lived on a ranch, a part of which was in Nevada and a part in California. Charles was called and testified similarly. (No one informed the court that the residence and outbuildings of the ranch were wholly in California.) Charles testified that it was his sincere belief that he was domiciled in Nevada, that in income tax returns he had stated his residence as Nevada (but he did not inform the court regarding income tax returns listing California as his residence), that he had voted in Nevada, that his motor vehicles were registered there, that he banked there, etc.

In support of the contention that the Flynn ranch proper was Charles' separate property, Charles testified that he had owned certain sheep and 440 acres of land at the time of his marriage to Alvera (purchased from a family partnership); that he had sold wool and the sheep and had used the proceeds to buy the Flynn ranch shortly after his marriage.

In this connection, in the California proceedings Alvera had offered to prove that the sheep had not been owned outright but that the purchase from the partnership had been by a promissory note; that this loan had merely been refinanced after the marriage to include both sheep and the

Flynn ranch; that the refinanced loan was paid off with community earnings after the marriage. After considerable evidence had been taken (in the California action) objection was made and sustained by the court. Error in the rejection of this proof will be discussed below.

None of this was brought out at the Nevada trial. The following excerpt from the reporter's transcript is revealing in this regard: "Q. [By Adams to Charles] We were discussing the matter of assets. Am I correct that the real property is entirely your own, separate property? THE COURT: Well, let's not go into that. MR. ADAMS: All right. Do you have that in mind, your Honor? THE COURT: Yes."

No evidence was given as to the value of the ranch. Values were given as to certain cattle and farm equipment, with offsetting indebtedness. Alvera was stated to have $1,700-$1,800 in household furniture and a 1951 Oldsmobile automobile.

Based upon this evidence and other evidence as to the grounds for divorce, the court, at the outset, stated: "You don't have to go into too many things, because it is apparent a divorce should be granted here," and after other evidence regarding the children the court made its decree. It found the parties to be both domiciled in and residents of Nevada. It awarded a divorce to Charles. It awarded sole custody of the youngest child, the son, to Charles, joint custody of Aileen to Charles and Alvera (inviting a designation by Aileen as to which parent she preferred to reside with); it ordered Charles to pay $60 per month child support while Aileen resided with Alvera. It found both the 440 acres of range land and the entire Flynn ranch to be the separate property of Charles; it found the livestock and ranch equipment to be community property and awarded it all to Charles; it stated that livestock association shares were part separate and part community and awarded all of them to Charles; furniture was awarded to the party then in possession thereof; no alimony was awarded Alvera.

The questions of law under the foregoing facts are whether the Nevada court had jurisdiction of the subject matter and whether the judgment is entitled to full faith and credit inviolable against collateral attack. ▮ The traditional view has been that: "Jurisdiction to grant a divorce rests on a bona fide domicile. Where neither party is domiciled within the state, no divorce can validly be granted and all proceedings, as well as the judgment, are void." (16 Cal. Jur.2d 356, and cases there cited.)

This concept is based upon the governing principle: "... [T]hat marriage is a matter of public concern, the public, through the state, has an interest both in its formation and in its dissolution, and the state which has that interest is the state of domicile, because that is where the party 'dwelleth and hath his home.'" (Goodrich, J. in *Alton* v. *Alton,* 207 F.2d 667.)

Or as stated by Justice Frankfurter in *Williams* v. *North Carolina,* 325 U.S. 226, 229, 230 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366] : "Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil. . . . The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance."

The *Alton* decision (arising in a case where the statute of the Virgin Islands purported effectually to give that territory jurisdiction to grant divorces to nondomiciliaries) held that the statute violated the due process clause (the 5th Amendment there, but if applied to a state the 14th Amendment). The decision touched off a flood of law review comments (34 Boston U.L.Rev. 216, 54 Colum. L.Rev. 415, 39 Cornell L.R. 293, 42 Georgetown L.J. 450, 67 Harv. L.Rev. 516 and 23 U. Cincinnati L.Rev. 266) and the decision was vacated and the case dismissed by the Supreme Court (347 U.S. 610 [74 S.Ct. 736, 98 L.Ed. 987]) after the case became moot.

In the concurring opinion of Justice Traynor in *Scott* v. *Scott,* 51 Cal.2d 249 [331 P.2d 641], at pp. 254-255, the concept of domicile as the "touchstone of divorce jurisdiction" is criticized, since it can be conceived that "a country other than the domicile may have a legitimate interest in the marital status of the parties, even though it does not accept the common law jurisdictional concept of domicile." He does point out, however, that if the place foreign to the domicile in fact has no legitimate interest in the marital status, then an attempt to assert jurisdiction would violate due process.

We need not, perhaps, pursue this inquiry further, since Nevada by an express statute prescribes domicile as a *jurisdictional* prerequisite. (Nev. Rev. Stats., § 125.020(2).)

It is well settled that where domicile is required the parties to a divorce action cannot, by consent, confer jurisdiction upon the courts of a state where they are not domiciled.

(*Roberts* v. *Roberts,* 81 Cal.App.2d 871, 879 [185 P.2d 381];
*Eriksen* v. *Eriksen,* 57 Cal.App.2d 532 [134 P.2d 825].)

To establish a domicile the union of act and intent is necessary. This rule has been expressed in a number of California cases where the question involved was whether a declared intent was real, the *act,* i.e., physical presence within the state being conceded; as where one party to a divorce moves into a state, remaining there just long enough to meet the residence requirements of that state, then obtains a divorce and moves back to the state of original domicile—or on to a new state. (*Crouch* v. *Crouch,* 28 Cal.2d 243 [169 P.2d 897]; *DeYoung* v. *DeYoung,* 27 Cal.2d 521, 524 [165 P.2d 457]; *Sampsell* v. *Superior Court,* 32 Cal.2d 763 [197 P.2d 739] at p. 774, footnote.) But the rule is equally applicable where the intent, a bona fide one, is conceded, but the question is whether it has been acted upon.

". . . [A] residence can be gained or lost only by the union of act and intent, but as the act alone is insufficient, so the intent alone is insufficient." (*Bragg* v. *Bragg,* 32 Cal.App.2d 611 [90 P.2d 329], at p. 614.)

Domicile is "an abode animo manendi, a place where a person lives or has his home, to which, when absent, he intends to return, and from which he has no present purpose to depart." (See note 159 A.L.R. 499 and cases cited, including *Ungemach* v. *Ungemach,* 61 Cal.App.2d 29 [142 P.2d 99].)

It is stated by Professor Beale (1 Beale, Conflict of Laws, pp. 149, 150) : "It is not enough that a man desires to acquire or to keep a 'legal residence' or 'legal domicil;' the intention necessary for the acquisition of a domicil is an intention as to the fact, not as to the legal consequences of the fact. 'A man's home is where he makes it, not where he would like to have it'. . . .

"One cannot have his only home in one place and a domicil in another, as he may have a mere residence in one place and a domicil elsewhere. A place which is a man's home must be his domicil (except where he has in fact more than one home). The intention requisite to acquire a domicil is the intention to have a home, and that is the only legally relevant intention; the domicil follows as a legal consequence, without regard to whether the consequence is desired or not. 'When you intend the facts to which the law attaches a consequence, you must abide the consequence whether you intend it or not.' " (See also *Blaine* v. *Murphy,* 265 F. 324, 325.)

Under these rules the Aldabes were domiciled in

California, notwithstanding where they wished to live. They had maintained their only abode there continuously for 17 years; they lived there when the Nevada proceedings were commenced—and Charles still resides there. (After the filing of the divorce action, Alvera, claiming molestation by Charles, left the ranch home and sojourned briefly and temporarily in Reno with the children before returning to California, where she still resides. According to her testimony she never intended to establish a home in Reno.)

The evidence which was introduced, both in the Nevada and California actions, with reference to the parties' declarations of intent, their banking, shopping, voting and car registration were, therefore, merely evidence of a desire to enjoy some of the benefits of Nevada residence, evidence which, because it collided with the fact that they made their only home in California and intended to do so, became legally irrelevant.

It follows from these facts that the State of Nevada had no legitimate interest in the marital status of these parties and therefore the Nevada court here was without jurisdiction over the subject matter.

The questions remain, however: (1) Can the Nevada decree, although in proceedings without subject-matter jurisdiction, be attacked collaterally? (2) How does the fact that appellant "participated" in the proceedings in Nevada affect the matter?

Where the collaterally attacking spouse had NOT participated in the proceedings in the divorce forum the first question was answered affirmatively by our Supreme Court in May 1946, in the case of *Crouch* v. *Crouch*, 28 Cal.2d 243 [169 P.2d 897]. There the husband, a California domiciliary, entered and remained in Nevada, as the lower court found, "solely for the purpose of obtaining a divorce from the plaintiff" (also a California domiciliary). The wife had been served constructively but did not appear in the Nevada action. The Nevada decree contained a finding that the husband was both domiciled in Nevada and had established a residence there. The lower court had held that the decree of the Nevada court was entitled to full faith and credit. Reversing, the Supreme Court said (on p. 249):

"It is a well established rule that jurisdiction to grant a divorce rests upon bona fide domicil. Where neither party is domiciled within the state, no divorce can validly be granted and all proceedings, as well as the judgment, are void. Stated

in another way, a decree of divorce rendered in one state may be impeached and denied recognition in another upon the ground that neither of the parties had domicil at the divorce forum, and this is true notwithstanding the recital in the decree from the other state of the jurisdictional fact of domicil or residence. [Citing cases.] This principle has been recognized by the United States Supreme Court in recent decisions (*Williams* v. *North Carolina,* 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]; *Esenwein* v. *Pennsylvania, supra* [325 U.S. 279 (65 S.Ct. 1118, 1119, 89 L.Ed. 1608, 157 A.L.R. 1396)], and has been consistently followed by courts of other states. [Citing cases.]''

The court in *Crouch* also cited cases holding that although there is a presumption of validity, ''it is always competent to collaterally impeach a decree of divorce rendered in another state by extrinsic evidence showing that the court pronouncing it did not have jurisdiction either of the parties or the subject matter. Thus the decree may always be attacked upon the ground that the foreign court had no jurisdiction because the petitioning party had not established a bona fide domicil.'' And the court adds: ''A decree based upon either personal or constructive service *or even a personal appearance* may be attacked upon this ground.'' (Emphasis supplied.)

*Crouch* v. *Crouch, supra,* with its statement last quoted (unnecessary there since Mrs. Crouch had NOT personally appeared in the Nevada action), was decided before the United States Supreme Court decision in *Sherrer* v. *Sherrer* (334 U.S. 343 [68 S.Ct. 1087, 1097, 92 L.Ed. 1429, 1 A.L.R.2d 1355]) June 1948, where the wife had left the marital domicile in Massachusetts, taking with her the children, purportedly for a vacation in Florida. Having arrived there, however, she notified her husband that she did not intend to return to him. Thereafter she obtained housing accommodations, placed her older child in school and secured employment for herself. Some months thereafter (more than the six weeks' residence requirement of Florida) she instituted divorce proceedings. The husband personally appeared and participated at the trial and was represented by counsel. Evidence of domicile and residence was introduced and a decree of divorce was entered, specifically finding bona fide residence and jurisdiction of the subject matter. After the decree the wife remarried, but remained in Florida with her new husband for several months, ultimately returning with him to Massachusetts. When the husband brought a Massachusetts action

with allegations challenging the validity of the Florida decree, the Massachusetts courts refused to accord it full faith and credit and held that the wife had never been a bona fide resident of Florida. On certiorari the ruling was reversed by a seven-to-two decision. The majority opinion written by Chief Justice Vinson held that the husband having appeared and participated in the Florida proceeding without availing himself of the opportunity to raise the jurisdiction question, the divorce court's finding of jurisdiction was res judicata and entitled to full faith and credit in Massachusetts. As stated in the summary, ''The desirability of according full faith and credit to judgments of courts of a sister state was thought to outweigh the interest of Massachusetts in the regulation of the marital relations of its citizens.'' Two significant statements in the majority opinion are to be noted:

(On p. 1435 [92 L.Ed.]) ''It should also be observed that there has been no suggestion that under the law of Florida, the decree of divorce in question is in any respect invalid or could successfully be subjected to the type of attack permitted by the Massachusetts court. The implicit assumption underlying the position taken by respondent and the Massachusetts court is that this case involves a decree of divorce valid and final in the State which rendered it; and we so assume.''

 The opinion in *Sherrer* also states (on p. 1439 [92 L.Ed.]) that there had been ''findings of jurisdictional fact made by a competent court in proceedings conducted in a manner consistent with the highest requirements of due process and in which the defendant has participated'' and the holding of the *Sherrer* case is (on p. 1436 [92 L.Ed.]):

''. . . [T]he requirements of full faith and credit bar a defendant from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister State where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the State which rendered the decree.''

*Sherrer* v. *Sherrer, supra,* was cited and its rule applied by our Supreme Court in *Heuer* v. *Heuer* (1949) 33 Cal.2d 268 [201 P.2d 385], where the portion of the *Sherrer* decision last quoted above was also quoted (on p. 271).

Under the rule in *Sherrer* two conditions must combine before it can be said that California must give full faith and credit to the decree of a sister state: (1) the decree must be

one not susceptible to collateral attack in the courts of the state which rendered the decree, and (2) there must be participation by the party aggrieved under circumstances which have afforded him full opportunity to contest the jurisdictional issues. We will try on the first of these conditions to see if it fits the facts.

We have before us the entire record in the Nevada proceeding. From this record it appears that no proof of a Nevada domicile by either party was ever made. At the trial counsel for Charles avoided, and seemingly studiously avoided, bringing out where the Aldabe abode was. The questions and answers put to Charles and two other witnesses sum up to: Q. Where do you (or does he) reside? A. On a ranch. Q. Where is the ranch? A. It is partly in California and partly in Nevada. Never once is the court apprised of the undisputed fact that the Aldabes' only abode on this ranch was in California.

It is one thing to say that where a court of one state decides it has subject-matter jurisdiction on conflicting evidence, another state, taking a different view of those facts, may not relitigate the matter. That was the situation in *Sherrer*. It is quite another thing to say that such lack of jurisdiction may not be litigated when on the record in the sister state proceedings it appears that there existed no proof to give the court jurisdiction. That is the situation here.

 It is stated in 30A American Jurisprudence, Judgments, section 267, page 333: ". . . The rule [that the adjudication by a sister state of jurisdictional facts is res judicata] involves the drawing of a distinction between the mere assumption of jurisdiction by the court which rendered the original judgment or the mere recital of jurisdiction in the judgment, and an express adjudication of the point after a full contested hearing. A distinction has also been made between a finding by the foreign court of the existence of facts which, if true, would give it jurisdiction and a finding that it had jurisdiction, upon a state of facts which did not in fact give it jurisdiction. In the former situation, the foreign adjudication as to jurisdiction has been held to be conclusive; in the latter, the foreign adjudication as to jurisdiction has been held not to be conclusive." (And see cases cited in the text quoted.)

The soundness of this rule seems manifest. Since the parties lacked a Nevada domicile the Nevada court was without jurisdiction of the subject matter. Being without jurisdiction, the Nevada judgment was *invalid in*

*Nevada,* and it would seem to follow, since absence of proof of domicile appears on the face of the Nevada record, it should be subject to collateral attack there as well as elsewhere regardless of participation by the parties in the proceedings (who, it must be remembered, cannot confer jurisdiction by consent). This is the rule in California as applied to void judgments other than in divorce. (See 28 West Cal.Dig., Judgment, § 485, p. 343 [13B McK. Dig., Judgments, §§ 293-295].) No Nevada case or statute has been found inharmonious to this. In the absence of proof to the contrary, it will be presumed that the law of Nevada and California are consonant. (*Gagnon Co., Inc.* v. *Nevada Desert Inn, Inc.,* 45 Cal.2d 448 [289 P.2d 466].) Even had the absence of facts necessary to give the Nevada court jurisdiction not appeared on the face of the Nevada record, "[t]he rule that a judgment cannot be collaterally attacked for want of jurisdiction unless such want appears on the face of the record . . . does not apply to a foreign judgment." (50 C.J.S., Judgments, § 893c (1), pp. 502, 530.) "A recital of jurisdiction in the judgment of a court of a sister state ordinarily is not conclusive, but may be contradicted by extraneous evidence." (50 C.J.S., Judgments, § 893 (2), p. 504, citing *Hammell* v. *Britton,* 19 Cal.2d 72, 81 [119 P.2d 333].)

It has been suggested, however, that where the unsuccessful party fully participates in the proceeding, he or she is estopped collaterally to attack the void judgment even though there is no jurisdiction. No case has been found so holding where, as here, the evidence of domicile in either party was wholly lacking. So to hold would be to give vitality to the weekend stopover Mexican divorce trade. We will not assert the rule contended for here. However, we need not declare the opposite rule. Because we have reached the conclusion that the evidence would have justified the trier of facts to find that "participation" of appellant in the Nevada proceedings was not such that she "has been accorded full opportunity to contest the jurisdictional issues;" and therefore the second limitation or condition of the rule in *Sherrer* v. *Sherrer, supra,* was not met.

True, Alvera herself instituted the Nevada proceedings. She contends, however, that she did so not only upon the advice of her own attorney, Streeter, but also upon the advice of the attorney who ultimately represented her husband. And this brings us to the offer of proof rejected by the court, which rejection we find to be error. Specifically,

the offer of proof was this: That several months after the Nevada divorce had been obtained, Charles visited Alvera at her Yolo County residence (at the home of her mother). Present were Charles, Alvera, Aileen, the daughter, the mother, Mrs. Deshom, and a friend, Virginia Mahoney; that at this meeting Charles made the statement that Adams had originally advised him "he could get a Nevada divorce decree and still live on the ranch but that after the divorce proceedings were instituted Mr. Adams advised him that it would be necessary for him to move into Reno . . ."; that Mr. Aldabe "told him that he wasn't going to move into Reno but that he was going to stay on the ranch; [that] at that time Mr. Adams instructed him to testify that it had been his intent to live in Nevada at all times during the period when he was actually a resident in California."

It was the theory of appellant that Charles and his attorney, as well as her own attorney, had participated in a fraud on the court in pretending a Nevada domicile, knowing the parties were domiciled in California. This evidence would have supported this theory, and it was error to exclude it. (See *Isserman* v. *Isserman,* 2 N.J. 1 [65 A.2d 508, 511].)

Also Adams had categorically denied Alvera's contention that he, when acting as *her* legal adviser, had told her, as he was said to have advised her husband Charles originally, that she could bring a Nevada divorce action. This rejected evidence tended to impeach Adams' denial. Since participation by Alvera in the Nevada proceedings was, if *real,* a vital factor, any proof which tended to substantiate her contention that such participation was induced by the husband's attorney was of great importance and its rejection was prejudicial.

Similarly, the trial court rejected an offer of proof through a Mrs. Johnson, as follows: That in another conversation with Charles Aldabe she asked him how he could get a Nevada divorce while residing in California, or did he reside in Nevada at the time, to which Aldabe had replied: " 'No, I got it by intent,' " and Mrs. Johnson asked him, "Intent of what?" And he said, " 'Well, I don't know, my lawyer just told me to say I was a resident of Nevada by intent and that is what I said.' " Rejection of this evidence was error for the same reason. If, as Alvera contends, the representations of her own attorney and of Charles' attorney combined to take her into the Nevada court, their activities in the proceedings subsequently were certainly not "conducted in a manner consistent with the highest requirements of due process."

On the contrary, they seem calculated to prevent her from having her day in court. We cite: (1) the failure of Streeter to withdraw as attorney of record after termination of the attorney-client relationship and his continuing to purport to represent Alvera; (2) entry by Streeter into a stipulation, without Alvera's authorization and against her known wishes, by which $1,300 claimed by Alvera as community funds were disbursed to pay his fee and Adams' fee; (3) the entry by him into another stipulation without Alvera's knowledge or consent by which the issues regarding the character of the very substantial properties of the party were materially changed; (4) failure of Streeter to notify Alvera of the consequences of this stipulation; and his failure to notify her of the date of trial (he states he relied upon notification to Smith, although he had previously learned that Alvera had taken her file from Smith's office); (5) Streeter's representation to the Nevada court on the date of the trial that the Aldabes were Nevada domiciliaries when he knew their home was in California, and the inference to the Nevada court, implicit in his comment of her having found a "sympathetic ear in California," that her claim to California residence was a sham; (6) his statement to the court that "I have been advised by her attorney that they are not going to appear here" which, from the record before us, does not appear to accord with the facts.

Respondent cites *Preston* v. *Wyoming Pac. Oil Co.,* 197 Cal. App.2d 517 [17 Cal.Rptr. 443], which holds that an unsuccessful party cannot collaterally attack a judgment obtained "in consequence of the neglect, inattention, mistake, or incompetency of [her] attorney, unless caused by the opposite party."

Here, however, the acts which combined to prevent Alvera from having a fair trial were not solely the product of the conduct of her own attorney. They were participated in by Charles and by Charles' attorney.

We pass the question of the dubious propriety of Adams representing one party to a divorce suit after having advised both regarding their marital problems and come to the events after Adams received the telephone call from Streeter (and we must accept the fact as probable) that he was withdrawing as Alvera's attorney. The agreement to split the $1,300 of claimed community funds all without Alvera's knowledge or consent was not unilateral on Streeter's part. Adams, the trustee of the fund, not only failed to assure himself of the consent of the *cestui que trust* but had been informed by Streeter that it would not be forthcoming, since he was told

that Alvera did not want her attorney to be paid anything. The contemporaneous act by the attorneys—changing the issues of the divorce proceeding regarding the status of the ranch and doing so in a manner that Alvera would not even have to know about it was ill-designed to afford Alvera a chance to meet Charles' new contention that this property was entirely separate, not partly community. Accepting Alvera's contention that she had no notice whatever of any of the proceedings after she discharged Streeter and adding to this Adams' knowledge of the break, plus the fact that knowledge of Alvera's whereabouts was available to Adams through Charles during this period, we cannot avoid the conclusion that both Charles, her adversary, and Adams, his attorney, were not free from responsibility for the withholding of notice and for the fact that Alvera never had a fair chance to be heard in this proceeding.

Certainly, she never has had a fair chance to raise the issue that the ranch, which she values at around a quarter of a million dollars, is community property. She has not even had a chance to put on her evidence in this regard in the California action. Objection to the introduction of this evidence was sustained and this ruling was error since the evidence was material as part of her proof that the unauthorized and undiscovered stipulation late in the litigation changing the issues vitally prejudiced her chance to defend her rights.

Finally, in the manner in which the case was presented to the Nevada court, a divorce obtained, property disposed of and child custody changed—practically as an ex parte matter —Streeter was not the sole offender. The withholding of the fact of the California residence of the parties was Adams' responsibility, so possibly is the way in which the ranch was represented to the court to be the separate property of Charles if the contentions of Alvera can be established: That at the time of the marriage the parties owned the barest equity in the ranch which was paid for out of community earnings.

In *Westphal* v. *Westphal,* 20 Cal.2d 393 [126 P.2d 105], after stating the rule that final judgments (of courts having jurisdiction) can be collaterally attacked only if an alleged fraud or mistake is extrinsic rather than intrinsic, our Supreme Court (per Justice Traynor) states on page 397:

". . . Fraud or mistake is extrinsic when it deprives the unsuccessful party of an opportunity to present his case to the court. [Citing cases.] If an unsuccessful party to an action has been kept in ignorance thereof [citing cases] or

has been prevented from fully participating therein [citing case], there has been no true adversary proceeding, and the judgment is open to attack at any time. A party who has been given proper notice of an action, however, and who has not been prevented from full participation therein, has had an opportunity to present his case to the court and to protect himself from any fraud attempted by his adversary. [Citing cases.] Fraud perpetrated under such circumstances is intrinsic. . . ."

In *McGuinness* v. *Superior Court*, 196 Cal. 222 [237 P. 42, 40 A.L.R. 1110], the court, illustrating instances in which there had been "in fact no adversary trial" quoting from *United States* v. *Throckmorton*, 98 U.S. 61, 66 [25 L.Ed. 93] states: " '[W]here the unsuccessful party has been prevented from fully exhibiting his case by fraud or deception practiced upon him by his opponent, as by keeping him away from court by a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where an attorney regularly employed corruptly sells out his client's interest to the other side,—these and similar cases which show that there has never been a real contest in the trial or hearing of the case'; such are, in the view of that tribunal, instances of extrinsic fraud."

The circumstances which deprive an adversary of a fair notice of a hearing or which prevent him from having a fair hearing may be acts of the opponent not amounting to actual or intentional fraud. Extrinsic mistake is sufficient. (*Antonsen* v. *Pacific Container Co.*, 48 Cal.App.2d 535 [120 P.2d 148]; *Davis* v. *Davis*, 185 Cal.App.2d 788, 793, 794 [8 Cal.Rptr. 874].) It is stated in the latter case (on p. 794): ". . . It is well established that in cases where the aggrieved party is unable to make out a case of intentional fraud, the courts . . . will extend a liberal interpretation to relieve him from a judgment taken without a fair adversary hearing. [Citing cases.] The basis for equitable relief in these cases, whether it be denominated 'extrinsic fraud' or 'extrinsic mistake' is that which has resulted in a judgment taken under circumstances of unfairness and injustice without affording a party the opportunity to participate in the proceedings."

The following cases, all decided after *Sherrer*, should be noted.

In *Burden* v. *Burden* (1957) 44 Tenn.App. 312 [313 S.W.

2d 566, 568, 569], where the wife had appeared in an Ohio action but had believed that a reconciliation had occurred and that the action was dismissed, but where her attorney had received notice of the trial, it was held by the Tennessee court that "[w]hether, as complainant claims, the Ohio decree was fraudulently obtained, it is apparent that a chain of circumstances prevented notice of the hearing being brought home to complainant" and the court, finding that "the requirements of due process have not been observed" refused to give full faith and credit to the Ohio decree. (See also *Ryan* v. *Ryan* (D.C. 1954) 139 F.Supp. 98; *Winters* v. *Winters* (1959) 236 Miss. 624 [111 So.2d 418, 420, 421].)

In *Isserman* v. *Isserman, supra,* 2 N.J. 1 [65 A.2d 508], the wife, after a Nevada divorce obtained by the husband, contended that, although she had appeared in the Nevada proceedings and had even been present at the trial, she had been actually "denied her day in court" (under circumstances far less convincing than here) and the New Jersey Supreme Court (noting the same quotation from *Sherrer* which we have set forth above) stated that she should not be precluded by the rule in *Sherrer* from collaterally attacking the Nevada decree.[1]

In *Chirelstein* v. *Chirelstein* (1950) 8 N.J.Super 504 [73 A.2d 628], after stating the rule in *Sherrer,* the court observes (on p. 634 [73 A.2d]):

". . . But I do not believe that these cases go to the length of requiring full faith and credit to be given to a decree which the plaintiff herself acknowledges to have been obtained by a fraud practiced upon the Florida court, as well as upon the State of New Jersey, and where the defendant's 'participation' in the proceeding did not apparently extend beyond the filing of a perfunctory answer, which at most operated to lift the Florida suit to a scarcely perceptible level above an ex parte proceeding. . . . The State of Florida certainly has no interest which is infringed by a refusal to recognize a decree thus confessedly obtained by fraud upon it, with respect to persons with whom that state has no domiciliary concern."

 We have stated, in outline, the evidence in the record pro and con which we deem material to the issues raised. We were required to do this, as stated above, to

---

[1] Reversal of the lower court decision in *Isserman* was, however, as we have noted above, because of error in the rejection of evidence by the lower court.

point out why errors in the rejection of evidence were prejudicial. This does not mean, however, that we may substitute ourselves for the trier of facts to weigh evidence and resolve conflicts where such weighing and resolution will determine which way the evidence preponderates to establish whether there was no real participation by Alvera in the Nevada proceedings, and whether she was, or was not, prevented from having a full opportunity to defend. From the record before us and from the evidence offered by appellant but rejected (assuming it to be true) the superior court, as the discussion above frankly infers, might well have reached the conclusion that Alvera *was* so prejudiced. But the rejected evidence has not been proved; it has only been stated by Alvera's counsel. When received in evidence, it may or may not have the impact which the statement suggests. After correcting the errors in rejection of evidence and after the admission of evidence relevant to the issues, in accordance with the views herein expressed, it will remain for the trier of facts from all the evidence then before the court to determine whether or not Alvera actually had her day in court in the Nevada proceeding.

The order and the judgment appealed from are both reversed; the case is remanded for further proceedings and a new trial in accordance with the views expressed herein.

Peek, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied December 6, 1962, and respondent's petition for a hearing by the Supreme Court was denied January 3, 1963. Peek, J., did not participate therein.