[Civ. No. 19154. Second Dist., Div. Two. Nov. 12, 1952.]

Estate of GRACE GLASSFORD, Deceased. ESTELLE G. DIBBLE et al., Respondents, v. BEN H. BROWN, as Public Administrator, Appellant.

Harold W. Kennedy, County Counsel, and Baldo M. Kristovich, Deputy County Counsel, for Appellant.

Gibson, Dunn & Crutcher, Richard E. Davis and Frank L. Mallory, Frank J. Kashare and Millard M. Mier for Respondents.

FOX, J.—The public administrator appeals from a judgment dismissing his petition for probate of decedent's will and codicil and for letters of administration with will annexed.

The decedent, Grace Glassford, a widow, was for many years a resident of and domiciled in New York City. In October, 1948, she came west "thinking," as she later stated, that she

would remain a year. She arrived in Denver, Colorado, the latter part of October, living there at a hotel until the middle of January, 1949, when she came to Los Angeles. She stayed two weeks at the Biltmore Hotel; a month at the Wm. Penn Hotel; and slightly less than two months at the DuBarry Apartment Hotel. In registering at each hotel she gave her address as the Gramercy Park Hotel, New York, and at each she took her room on a day-rate basis. During her stay at the DuBarry she spent ten days at the California Lutheran Hospital. Finally, she spent 22 days at the Shatto Sanitarium, where she died on May 21, 1949.

Upon her arrival here decedent opened a checking account at a bank near her hotel. When she moved to the DuBarry she closed that account and opened another at a branch of the same bank in the vicinity of the DuBarry, giving the latter as her address. She also gave the DuBarry as her address when she entered the hospital.

On February 9, 1949, the decedent wrote a letter to the manager of the Tuscany Hotel in New York in which she stated: "I am a New Yorker but came West the last of October thinking I would remain a year. However, the urge to return is pretty strong and strangely enough I feel better in New York than I do here." She then asked whether the Tuscany would have a room for her soon and what its rates would be, adding that she would need time to secure a room reservation on the train for four nights and to pack her trunk. On March 14, 1949, while Mrs. Glassford was in the hospital, her income tax return for 1948 was filed with the Collector of Internal Revenue at Los Angeles, and her address given as the DuBarry.

Shortly before she left the hospital on March 22, 1949, her physician advised her that she was suffering from an inoperable, far-advanced cancer and had only a few weeks to live. On that occasion her doctor said to her, "Your home is in New York, and your folks live in New York, and I think you ought to go back to them because you are not going to live long, and it would be pleasanter for you to be with your relatives and friends when you die than to be here among strangers." After leaving the hospital Mrs. Glassford told one of the clerks at the DuBarry that the doctor had told her she was going to die and should return to her relatives in New York, but it didn't make sense to her to go home just to die; that she did not want to be a burden to her sister since she had plenty to do without worrying about her; and that

she intended to stay here and die. In a conference with her attorney regarding a codicil to her will, at the sanitarium shortly before her passing in May, Mrs. Glassford said she did not intend to go back east; that there was no reason for her to do so; and that she did not think her condition would permit the trip.

On April 1, 1949, Mrs. Glassford made application for ten $1,000 United States government bonds. On April 12 she rented a safe deposit box at the bank where she carried her checking account, and on April 23 she stored her fur coat at Bullock's Wilshire. On each of these occasions she gave the DuBarry as her address.

At the time of Mrs. Glassford's death there were in her safe deposit box in Los Angeles United States government bonds of the approximate value of $58,000 and $3,000 in her checking account. Her fur coat, valued at $1,000, was in storage.

Decedent's will was admitted to probate in New York in October, 1949, but a purported codicil was denied probate in September, 1950. All the interested parties in the will and purported codicil appeared in the New York proceedings.

In May, 1950, the public administrator of Los Angeles County was appointed special administrator of decedent's estate and in the following October he was appointed special administrator with general powers. He took possession of the property, published notice to creditors, and filed inventory and appraisement. Bullock's filed a claim for $105.00, and the county of Los Angeles has a claim for 1949-1950 personal property and solvent credits taxes amounting to approximately $62. Meanwhile, on August 31, 1950, the public administrator had filed a petition for probate of the will and codicil and for letters of administration with will annexed. On October 9, 1950, decedent's sister and nieces, individually, and her sister and brother-in-law, as executors of her will, filed grounds of opposition to the probate of the will and purported codicil, alleging that the decedent was a resident of New York at the time of her death, that her will had already been admitted to probate in New York, and that the probate court here had no jurisdiction to admit the will and codicil to probate and grant letters of administration. Following a trial of the issues raised by the petition for probate and the opposition thereto, a judgment was entered dismissing the petition of the public administrator.

The court found Mrs. Glassford was not a resident of Los Angeles County at the time of her death but that she was a resident of New York. The public administrator challenges the sufficiency of the evidence to support this finding. The challenge, however, is not well founded. ■ While residence has different meanings for different purposes (Restatement, Conflict of Laws, § 9(e)), it is plain that residence as used in section 301, Probate Code, is synonymous with domicile. ■ The concept of domicile involves the concurrence of physical presence in a particular place with the intention to make that place one's home. ■ "The acquisition of a new domicile is generally understood to require an actual change of residence accompanied by the intention to remain either permanently or for an indefinite time without any fixed or certain purpose to return to the former place of abode." (*DeYoung* v. *DeYoung*, 27 Cal.2d 521, 524 [165 P.2d 457].) ■ The judicial concept of domicile is essentially equivalent to the lay idea of home. (Restatement, Conflict of Laws, § 12; 61 Harv.L.Rev., 1234.) It embodies a disposition towards permanence, an attitude of attachment. (See *Texas* v. *Florida*, 306 U.S. 398, 425-426 [59 S.Ct. 563, 83 L.Ed. 817, 121 A.L.R. 1179]; *District of Columbia* v. *Murphy*, 314 U.S. 441, 455 [62 S.Ct. 303, 86 L.Ed. 329].) ■ Also, domicile has a continuing quality because a person always has a domicile and does not lose one until another is acquired. (Restatement, Conflict of Laws, § 23; Gov. Code, § 244(c).)

It is clear that up to February 9, 1949, when Mrs. Glassford wrote the manager of the Tuscany Hotel in New York regarding a room and their rates, she was still domiciled in New York. It is claimed, however, by the public administrator, that her acts and attitude thereafter demonstrate an unmistakable intention to change her domicile to California. The significance of these matters must be determined in the light of Mrs. Glassford's current situation and condition. ■ The first event to which our attention is directed is that on March 7th Mrs. Glassford transferred her checking account to a branch of her bank which was in the immediate vicinity of the DuBarry, to which she had moved three days previously, and that she gave the DuBarry as her address. The transfer of her account was simply a matter of convenience, and, of course, she would naturally give the bank the address of the place where she was staying so as to facilitate communication. This was a normal course of conduct and without significance on the question of an intention

to change her domicile to California. In this connection it should be noted that she was living at the DuBarry on a day-rate basis. On March 13th she entered the hospital. Her income tax return was filed for her on the following day with the Collector of Internal Revenue at Los Angeles, and it gave the DuBarry as her address. In view of the approaching deadline for filing the return, the distance between Los Angeles and New York, and Mrs. Glassford's physical condition, it is entirely likely that the return was filed here as a matter of convenience and without any thought that it would have any effect upon her domicile.

It was shortly before decedent left the hospital on March 22d that she was advised by her doctor that she had only a few weeks to live. He suggested that she return to her home and relatives in New York. The critical nature of her illness is emphasized by the fact that she passed away two months later, on May 21st. She was apparently resigned to the prognosis of her doctor and realized her physical inability to travel across the country. It was in this state of desperation and helplessness that she expressed the thought that she would remain here and die. ■ "But knowledge that one will never again be able, on account of illness, to return home does not necessarily establish a change of domicile." (Beale on Conflict of Laws, vol. 1, p. 173.) ■ It is also pointed out by Professor Beale, page 175, *supra,* that "The mere fact that an invalid has given up the hope of returning to his old home, so long as he retains his feeling for it, is not tantamount to an intent to make a new home."

■ Under these circumstances the trial court could reasonably conclude that decedent's determination to remain here until she died was not a free choice on her part but compelled by circumstances over which she had no control; that her stay in California was not for an indefinite period, being originally limited to one year, and later, when advised of her mortal illness, limited by an expected event (her death) which although uncertain in time was controlled by existing facts of which she had knowledge. (See *United States* v. *Luria,* 184 F. 643, 651.) It is apparent that her stay here was dictated by expediency, for a temporary and limited purpose, and with no thought, purpose or intent of establishing a home here.

The public administrator points to the fact that in April (after being advised of her condition by her doctor), decedent gave the DuBarry as her address in an application

for the purchase of war bonds; when renting a safe deposit box at her bank, and when storing her fur coat at Bullock's Wilshire. These were all transactions in which it was important and appropriate that the other party know where she was living and consequently where she could be reached. This is illustrated by the fact that after decedent went to the sanitarium the bank struck out the former address and inserted as her address that of the sanitarium. Decedent's use, therefore, of her Los Angeles address in these transactions was not of compelling significance.

Finally, our attention is directed to a conference at the sanitarium on May 13th (eight days before her death) with her attorney regarding a codicil to her will. In response to his inquiry as to where her home was, she replied, "Well, I live here. I have no other place to live." That was, of course, literally true, but it does not necessarily mean that she had changed, or then intended to change, her domicile to California. It rather expressed her resignation to the reality with which she was faced.

From all the facts, the trial court could reasonably draw the inference that the decedent never intended to change her domicile to California, hence she was domiciled in New York at the time of her death. Consequently, the court properly refused to grant the petition to the public administrator for an original probate of decedent's will and codicil since she was not domiciled here at the time she passed away.

 The public administrator's second ground of appeal is that, regardless of the decedent's domicile, the court had jurisdiction to appoint an administrator by virtue of section 301 of the Probate Code, which provides: "Wills must be proved, and letters . . . of administration granted and administration . . . had, in the superior or . . . court: . . . (2) Of the county in which the decedent died, leaving estate therein, . . ." The public administrator contends that since Mrs. Glassford died in Los Angeles County leaving an estate within the meaning of the statute, as well as unpaid local creditors, the court abused its discretion in denying his petition for probate of the will and for letters of administration with the will annexed. This argument is well taken.

 It is generally recognized that each state is invested with plenary power to regulate the administration of the estates of deceased persons, so far as the property of such persons physically situated within its borders is concerned. (*Estate of Clark*, 148 Cal. 108, 112 [82 P. 760, 113 Am.St.

Rep. 197, 7 Ann.Cas. 306, 1 L.R.A.N.S. 996]; *Estate of Estrem,* 16 Cal.2d 563, 567-568 [107 P.2d 36].) ■ Although the law of the domicile of a nonresident decedent determines the right to succession and distribution of the personal property of such person which has its physical situs in a foreign jurisdiction (*Estate of Hodges,* 170 Cal. 492, 495 [150 P. 344, L.R.A. 1916A 837]; *Estate of Barton,* 196 Cal. 508, 512 [238 P. 681]), the existence of an estate belonging to a nonresident decedent in a foreign state may make it subject to an ancillary administration under the laws of such state. (*Murphy* v. *Crouse,* 135 Cal. 14, 19 [66 P. 971, 87 Am.St.Rep. 90]; *Estate of Edelman,* 148 Cal. 233, 239 [82 P. 962, 113 Am.St. Rep. 231].) ■ One of the dominant purposes of an . ancillary administration is the collection and conservation of a decedent's domestic assets for the benefit of local creditors. (*Murphy* v. *Crouse, supra; Curtis* v. *Schell,* 129 Cal. 208, 220 [61 P. 951; 79 Am.St.Rep. 107]; 11B Cal.Jur. p. 854, § 1336.) ■ To prevent injury or inconvenience to local creditors, a state may refuse to permit the property of a decedent to be withdrawn from its borders until debts due such creditors have been satisfied. (*Baker* v. *Baker, Eccles & Co.,* 242 U.S. 394, 401 [37 S.Ct. 152, 61 L.Ed. 386]; *Murphy* v. *Crouse, supra.*)

In the light of these general principles of law and the specific provisions of section 301(2) of the Probate Code, it is manifest that if Mrs. Glassford left an estate here it was properly susceptible of local administration to achieve the objects hitherto noted. ■ The word ''estate,'' when used in probate proceedings and statutes, is a comprehensive term and is ordinarily applied to describe in a most general fashion the property comprising the assets of a deceased. (*Estate of O'Gorman,* 161 Cal. 654, 658 [120. P. 33]; *Security-First Nat. Bank* v. *Stack,* 32 Cal.App.2d 586, 593 [90 P.2d 337].) It is an expression employed to encompass the totality of the assets and liabilities of a decedent. (*Tanner* v. *Estate of Best,* 40 Cal.App.2d 442, 445 [104 P.2d 1084].) ■ It is inextricably bound up with the concept of property, and as characterized by the court in *California Trust Co.* v. *Anderson,* 91 Cal.App.2d 832, 838 [205 P.2d 1127], adopting the definition of ''estate'' as given in Webster's New International Dictionary: ''. . . the word 'estate' may mean 'property' or 'The degree, quality, nature and extent of one's interest in or ownership of property, real or personal.' '' ■ The

word property is a generic term, ''and is sufficiently comprehensive to include every species of estate, both real and personal, whether choate or inchoate, . . . whether corporeal or incorporeal . . . The word is sometimes used in the sense of 'estate' . . .'' (*Hunt* v. *Authier*, 28 Cal.2d 288, 295 [169 P.2d 913, 171 A.L.R. 1379], quoting from *Ponsonby* v. *Sacramento Suburban Fruit Lands Co.*, 210 Cal. 229, 232 [291 P. 167].) We are satisfied that all the items of property over which the public administrator acquired control under his special letters of administration constituted assets comprising a part of decedent's estate in the sense that this word is used in Probate Code, section 301, authorizing the appointment of an administrator. (*Estate of Waits*, 23 Cal.2d 676, 680 [146 P.2d 5].)

This conclusion is supported quite apart from the language of Probate Code, section 301(2). A state where tangible property is located at the death of its owner has jurisdiction to administer it. (*State of Iowa* v. *Slimmer*, 248 U.S. 115, 120-121 [39 S.Ct. 33, 63 L.Ed. 158].) The general rule as to bonds is that for purposes of ancillary administration they may be treated as assets in the place where the documents are found. (*State of Iowa* v. *Slimmer, supra*; 3 Beale, Conflict of Laws, p. 1480, § 471. See *Estate of Robinson*, 19 Cal.2d 534 [121 P.2d 734], where letters of administration were issued on estate of nonresident claimed to consist of United States bonds.) So, also, for the founding of a local administration, a debt is assets at the domicile of the debtor (*McCully* v. *Cooper*, 114 Cal. 258, 262 [46 P. 82, 55 Am.St.Rep. 66, 35 L.R.A. 492]; *Estate of Waits, supra*) and administration of bank deposits may be had as a part of the estate in the state where the bank is located. (*Gregory* v. *Lansing*, 115 Minn. 73 [131 N.W. 1010, 1011]; *In re Smith's Estate*, 55 Wyo. 181 [97 P.2d 677, 684]; 3 Beale, Conflict of Laws, p. 1487; 2 Woerner, American Law of Administration, p. 679, § 205.)

Reverting to the situation before the court based on the allegations in the petition, the grounds of opposition raised by contestants, and the facts elicited at the hearing, it is clear that the court's recognition of the validity of the New York proceedings admitting the will to original probate there as the place of Mrs. Glassford's domicile, was not an obstacle to its ancillary probate in Los Angeles County. By the plain language of Probate Code, section 301(2), wills of nonresident decedents must be proved and administration

undertaken in the county in which such person died leaving an estate. The executors having failed to apply for letters of administration, they waived their rights thereto (Prob. Code, § 324) and the court was bound to grant letters in the priority established by the Probate Code (§§ 409, 422). The public administrator was the only petitioner for such letters and the court had no choice but to grant them. To deny them, in the face of the fact that administration had already been properly undertaken by the public administrator, and costs incurred for which the estate was liable and in view of the existence of unpaid creditors, was a clear abuse of the court's discretion. The court acted in disregard of the statute which provides for the administration of the property contained in the estate of a nonresident decedent (Prob. Code, § 301(2)), and contrary to the policies underlying ancillary administration long announced by our courts. (*Curtis* v. *Schell,* 129 Cal. 208, 220 [61 P. 951, 79 Am.St.Rep. 107]; *Murphy* v. *Crouse,* 135 Cal. 14, 19 [66 P. 971, 87 Am. St.Rep. 90].) ▇▇▇ Local creditors and claimants need not be compelled to present their claims in another forum nor accept unenforceable assurances of payment by foreign executors which may later be repudiated while assets are situated in this state which may properly be applied to satisfy the obligations against the estate. (See *Estate of Card,* 64 Cal.App. 268, 272 [222 P. 145].)

Contestants rely on *Estate of Daughaday,* 168 Cal. 63 [141 P. 929], as authority for the proposition that the probate court has jurisdiction to refuse to grant probate and letters of administration where no useful purpose would be served thereby. It will be noted that the court recognized that protection of local creditors was one of the main purposes of administration (p. 71), but that problem was not before the court. In that case it was held that the asserted claim was so "visionary and unsubstantial" as to have no reasonable and colorable value and could not be made the basis for a grant of ancillary letters of administration. The court further pointed out that petitioner's place of remedy was in a court of equity, not a probate court. These factors are in diametric opposition to the situation presented in the instant case and serve to distinguish it.

Other cases cited by contestants, *Estate of Hodges, supra, Miller* v. *McColgan,* 17 Cal.2d 432 [110 P.2d 419, 134 A.L.R. 1424], and *Estate of Layton,* 217 Cal. 451 [19 P.2d 793, 91

A.L.R. 480], are of no assistance to them. While these cases establish that California follows the doctrine of *mobilia sequuntur personam* so far as taxation and distribution of and succession to the personal property of a nonresident decedent is concerned, they contain no suggestion that tangible or intangible personal property is not susceptible of ancillary administration in the state where it has its physical situs.

For the foregoing reasons, the judgment must be reversed, with directions to admit the witnessed will to probate as a foreign will, and to issue letters of administration with the will annexed to the public administrator.

Moore, P. J., and McComb, J., concurred.