[Civ. No. 30230. Second Dist., Div. One. Nov. 4, 1966.]

Guardianship of the Person and Estate of EARL G. MOSIER, an Incompetent Person. LEE NORA RICHARDS et al., Petitioners and Appellants, v. EARL G. MOSIER et al., Objectors and Respondents.

Sanders & Moulton, Robert H. Sanders, Andress, Woodgate, Richards & Condos and William Andress, Jr., for Petitioners and Appellants.

Leo E. Anderson, Karl L. Davis, Jr., James M. Orendorff and Meserve, Mumper & Hughes for Objectors and Respondents.

LILLIE, J.—This is an appeal by Mrs. Richards, the only daughter of Earl G. Mosier,[1] from an order adjudging him to be incompetent within the meaning of section 1460, Probate Code,[2] appointing J. Robert Meserve as the guardian of his person and Security First National Bank the guardian of his estate; also challenged by this proceeding is the order's additional provision that Mr. Meserve's powers as temporary conservator of Mr. Mosier's person and estate remain in full force until the final determination of any appeal by a party to this controversy. In ordering the issuance of letters to the parties above named, the court denied the petition of Mrs. Richards seeking similar powers for herself upon the ground that she was a resident of Texas and accordingly "not a fit and proper person" to be appointed either guardian of the person or of the estate of Mr. Mosier. Related to this conclusion is the further finding that Mr. Mosier during all times

---

[1] "Appellant" and "Appellants" will be used interchangeably since Mrs. Richards as "Attorney in Fact for Earl G. Mosier" has also appealed.

[2] Pertinent here is that portion of section 1460 providing for the appointment of a guardian where the individual concerned, by reason of old age, disease, or weakness of mind, is unable unassisted to take care of himself or his property and is thereby likely to be deceived or imposed upon by artful and designing persons.

here pertinent was and is a resident of California and domiciled within this state.

One of the principal points on appeal is the asserted insufficiency of the evidence to support the specific finding that Mr. Mosier became domiciled in California on or about August 5, 1964. Another assignment of error concerns the trial court's failure to give full faith and credit to a Texas judgment obtained by Mrs. Richards in March of 1965 which decreed to the contrary; she contends that personal service having theretofore been had upon Mr. Mosier in California, such judgment (entered on March 11, 1965) declares that he is a resident of Dallas County, Texas, that he is incompetent and that Mrs. Richards as his next of kin is entitled to be (and is) appointed guardian of his person. Other grounds of appeal will be considered seriatim.

For sheer acrimony of presentation on appellants' part this case has few parallels, such bitterness being unfortunately characteristic of litigation involving a third person's estate where the parties are related to such person and to each other. The syndrome, if we may use that word, usually makes its presence known in will contests. In the present case, of course, Mr. Mosier is still in the company of the living; but he is of an advanced age (more than 80), undeniably ill and in need of constant medical attention. He is also possessed of considerable estate—between $400,000 and $500,000. True, appellants profess to have no quarrel with the appointment of respondent bank as guardian of the estate, their criticism being directed to the selection of respondent Meserve as guardian of the person and, in that connection, his integrity as a member of the legal profession is brought under attack. (See A.O.B. pp. 49 et seq.) But appellants insist that the incompetent is not a resident of California; in that regard, the trial court (summing up) observed: "I haven't any doubt in my mind that if Mr. Mosier were taken back to Texas, that a new Will would soon be executed. There is no question about that. If he is not taken back to Texas, I think the evidence sufficiently shows that we are going to have a Will contest on a Will that has been offered into evidence. So that it wouldn't make any difference which way Mr. Mosier executed a Will, the opposing factions, the brother and sister as distinct and against the daughter are going to make a fight of it because that is the way the feelings have developed in this case and they are the feelings that we see over and over wherever money is at stake." (Rep. Tr. pp. 948-949.) The sister referred to above is Mrs.

Laura Moorhead; a widow in her late seventies, she has resided in Los Angeles for some 50 years. Mr. Mosier's brother, Harold, resides in La Jolla, California; the youngest of the three, he has been Mr. Mosier's business associate for some time.

We first discuss the finding of residence and domicile[3] in California upon which appellants have mounted an elaborate assault. Domicile concededly being governed by a person's intention, it is asserted that "there is absolutely no evidence that Earl Mosier intended to make California his home." Such assertion is accompanied by a highly partisan recital of the evidence which overlooks or disregards the limited powers of this court, as well as an erroneous statement of the law applicable at this stage of the proceedings. ▮ With respect to the latter, it is argued that since respondents claimed a change of Mr. Mosier's domicile elsewhere to California, they had the burden of proof in that regard, citing 16 Cal.Jur.2d, "Domicile," § 15, p. 661. But that rule applies to the trier of fact only; this court does not determine factual issues. The same is true of the balance of appellants' argument respecting the evidence in its totality received on the issue of domicile. ▮ Although appellants say otherwise, such evidence is in conflict; hence "The evidence must be considered by the appellate court, but not weighed as against the conflicting evidence, and it is immaterial that the appellate court would have determined that the weight of the evidence favored the appellant." (4 Cal.Jur.2d, "Appeal and Error," § 606.) ▮ Too, in such consideration "All of the evidence most favorable to the respondent[s] must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384].) ▮ As stated by Witkin (3 Witkin, Cal. Procedure (1954) p. 2250) : "The test . . . is not whether there is substantial conflict, but rather whether there is *substantial evidence in favor of the respondent[s].* If this 'substantial' evidence is present no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed." ▮ Viewed in the above light, as will hereinafter appear,

---

[3]The two words are deemed synonymous in proceedings of this kind. (*Estate of Glassford,* 114 Cal.App.2d 181, 186 [249 P.2d 908, 34 A.L.R. 2d 1259].)

there is evidence of sufficient substantiality to support the finding challenged.

Our chronological summary of the background facts commences in April of 1964, on the last day of which month Mr. Mosier's wife of 38 years, Georgia, died suddenly in Muskogee, Oklahoma. The couple was then en route to their home in Tulsa after a brief visit with Mrs. Richards, their adopted daughter, at the latter's home in Dallas. (After an earlier marriage terminating in divorce and apparently contributing to a temporary estrangement between father and daughter, Mrs. Richards, whom the Mosiers adopted in 1937, married her present husband, a Dallas practicing attorney, in 1962; she has three children (two sons and one daughter) by the earlier marriage whose ages, at the time of trial, were 19½, 18½ and 17½ years respectively.) After Mrs. Mosier's funeral (May 2) which Mrs. Richards attended, she and her father drove back to Dallas where a room, specially built for the use of either him or his deceased wife at the newly completed Richards' residence, was made ready for his occupancy. However, he found life there unacceptable. He told a Tulsa friend, Mrs. Deatherage, that he could not "take the kind of life that they live down there," adding "there is too much drinking, too much noise. I cannot take it." These statements were made during one of his subsequent trips back to Tulsa; the Mosier home having been closed following Mrs. Mosier's death, he would stay at a motel and once mentioned to Mrs. Deatherage that "I haven't a home." He also told this witness: "I haven't any place to go and I want to get with some of my blood relations." To that end, he drove out to California in July of 1964 and visited with his brother in La Jolla for five or six days. According to Harold Mosier, his brother spoke with some disparagement of the Richards family: ". . . they seemed to think that he was an old fool . . . they didn't observe any period of mourning . . . there was too much drinking. . . ." Other derogatory references to the Richardses we need not set forth. Finally, upon his return to Tulsa later that month or early in August, he telephoned his sister in Los Angeles. While they had not seen each other for many years, the evidence indicates that there was more than mere rapport between sister and brother. He told Mrs. Deatherage about his telephone conversation with his sister: "She invited me to come to visit her . . . I am going out there. I am going right away." The witness added: "And he was just so happy."

Mr. Mosier arrived in Los Angeles on August 5; almost

immediately he was admitted to Good Samaritan Hospital where he remained for some five days. His condition was diagnosed as diabetes with some evidence of arterial hypertension, a disturbed bowel condition, heart disease and an emotionally depressed state of mind. Upon leaving the hospital, he went to live with his sister. He opened a personal bank account with a Los Angeles bank. In September he flew back to Tulsa on business; he telephoned Mr. Richards from Tulsa on October 1, stating that he was going back to Los Angeles. Later that month (October) Mrs. Deatherage shipped his clothes to Mrs. Moorhead's home; she did this after a meeting with Mr. Mosier at her Tulsa home. In this same month he again returned to the hospital for treatment; an expert psychiatrist was consulted, and he recommended shock treatments. These were administered in November of the same year. A conservatorship having also been recommended by his doctor, Mr. Mosier consented to the institution of such proceedings in Los Angeles. Nominated as conservator was respondent Meserve whose law firm, it appears, had participated in the administration of his father's estate. Hearing of the matter on February 8 was continued for one week at the request of local counsel engaged by the Richards family; thereafter, without notifying others concerned, they obtained a power of attorney from Mr. Mosier, had him sign instructions to terminate the California proceeding and then sought to take him back to Texas from a convalescent home in Glendale where he was then recuperating under medical supervision—they were finally halted at the airport.[4] In its summation (quoted in part earlier), the trial court understandably described such actions as carried out by persons who ''were not content to let the California courts run their course.'' Certainly it is but another dreary chapter in the present bitterly contested controversy.

Eventually the matter came on for hearing after Mrs. Moorhead had filed a petition for appointment of respondent Meserve as permanent conservator, and after the Richards family had petitioned for termination of the conservatorship; the latter application was followed, 10 days later, by the filing of a petition by Mrs. Richards for her appointment as guardian of her father's person and estate. (One month thereafter, the above notwithstanding, she sought and obtained the

---

[4]At the airport the Richards party was advised that respondent Meserve had been appointed temporary conservator on ex parte petition of Mrs. Moorhead; upon being shown a certified copy of the subject order, the plan to remove Mr. Mosier to Texas was abandoned.

172

Texas judgment which is said to be determinative of the issues here.) The trial court considered the several petitions and reached the conclusions from which the present appeal has been taken.

Appellant takes the position that her father's presence in California was merely that of a visitor; she points to several evidentiary items which would well tend to support such view—for example, when Mr. Mosier first entered the hospital, even Mrs. Moorhead advised the admitting office that he was in Los Angeles on a visit. She also contends that the date of the onset of her father's incompetency has never been fixed; hence, and certain non-California cases are cited, only a person *sui juris* has the legal capacity to change his domicile.

As shown earler, it was for the trial court to determine whether respondents had carried the burden of establishing Mr. Mosier's intention to change his domicile. It is the law that in determining the fact of such intention, the acts and declarations of the party must be taken into consideration. (16 Cal.Jur.2d, "Domicile," § 16, p. 662.) Over appellant's objection that such testimony was hearsay, several witnesses testified to statements made by Mr. Mosier that he intended to make California his home. The objection was properly overruled not only because of the applicable principle immediately above cited but also because "When intent is a material element of a disputed fact, declarations . . . made after as well as before an alleged act that indicate the intent with which [the person] performed the act are admissible in evidence as an exception to the hearsay rule, . . ." (*Whitlow* v. *Durst,* 20 Cal.2d 523, 524 [127 P.2d 530].) While Mr. Mosier's statements to Mrs. Deatherage and to his brother, above quoted, might indicate that he had not then finally determined upon Los Angeles as his permanent domicile, he subsequently told other persons that he regarded that city as his place of residence. True, these declarations were to individuals with considerable interest in the outcome of the instant litigation; one was employed by Mrs. Moorhead and another witness who testified to Mr. Mosier's intentions in this regard was his brother. If credence was accorded their testimony, however, the trial court's action is conclusive. In that regard, the question of a decedent's residence was involved in *Estate of Winzeler,* 42 Cal.App.2d 246 [108 P.2d 720], where the court declared: "Direct evidence of one witness who is entitled to full credit is sufficient to prove any fact except

perjury or treason and is necessarily sufficient to create a substantial conflict in evidence regardless of inferences supporting testimony to the contrary." (P. 248.) In our case, of course, we have more than one witness substantiating respondents' claims; we cannot disturb the finding implicit in the court's ultimate decision that these witnesses were entitled to be believed.

█ It is also the law that declarations as to residence when accompanied by acts indicative of the declarant's intentions become even more persuasive of the person's state of mind. (*Estate of Brady*, 177 Cal. 537, 539 [171 P. 303].) █ These acts are referred to by the court in its summation: ". . . there are some things which impressed the court and one of the major things is that Mr. Mosier left Texas of his own free will and came to California. There was absolutely nothing to show that the efforts of anyone in California caused Mr. Mosier to leave Texas and even if we were to assume that he started out here purely on a visit, the evidence would indicate that had he desired to return to Dallas he would have done so." Continuing, "We have, for example, the telegram which came from him in, I believe, September of 1964, when he left California and without Mrs. Moorhead's knowledge, indicating that he was going on to Tulsa and then he came back. Now, if he didn't want to be in California he didn't have to come back. Nobody was putting any persuasion upon him. . . ." And still further: "There was a lot of testimony that he said that he did not like Dallas and intended to stay here so that when we get into the month of September, he has been in the hospital here, but he was out and he decided to go to Tulsa. He didn't stay, but he came back. If it had been his desire to keep his home in Texas, he could have very easily returned there." We consider the above sufficiently dispositive of the issue of residence which, we are convinced, involved the resolution of factual questions. That residence or domicile primarily involves factual questions is borne out by the *Glassford* case (*supra*, 114 Cal.App.2d 181), relied on by appellant, as well as an early case (*In re Donovan*, 104 Cal. 623 [38 P. 456]) which declares that "it was for the court to determine from the whole of his testimony what his intention was." (P. 625.) Both decisions affirmed the lower court's conclusion that the person concerned was not a resident of California; here, for reasons already discussed, the conclusion was otherwise.

█ The subsidiary contention that, absent any finding as to the onset of his incompetency, Mr. Mosier could not intelli-

174

gently form any intention to change his domicile is likewise without merit. ██ The main purpose of the statute pursuant to which these proceedings were commenced (Prob. Code, § 1460) is the "Protection of the incompetent from others." (*In re Zanetti*, 34 Cal.2d 136, 143 [208 P.2d 657].) ██ As in *Zanetti*, the incompetency here need not be the result of "mental illness" and no confinement is contemplated. It is not suggested by appellant that Mr. Mosier was so far deranged that he was incapable of making a valid will; indeed, one of the exhibits offered by appellants was an attorney-drawn will, executed by him on August 12, 1964, which declared that he was a resident of Tulsa.[5] As every lawyer knows, one of the first recitals in an instrument of this kind is a statement of the maker's residence. If Mr. Mosier was able to make an intelligent disposition of his property, it would seem to follow that he was able to make an intelligent declaration of his place of residence. Furthermore, in a will contest "Proof of incompetency in a guardianship proceeding is evidence of mental condition on the date of the adjudication but it is not *prima facie* evidence of testamentary incapacity so as to shift the burden of proof to the proponent of the will. . . ." (*Estate of Worrall*, 53 Cal.App.2d 243, 247 [127 P.2d 593].) ██ We conclude, therefore, that the fixing of the date of incompetency does not militate against the finding that Mr. Mosier had intelligently determined upon his domicile prior thereto.

██ We next discuss the claim that the trial court erroneously failed to give full faith and credit to the Texas judgment. Appellant points to certain Texas statutes, assertedly similar to section 1461 of our Probate Code, as amended in 1959, providing for service of process outside the state upon a domiciliary of Texas by personal service of the citation commanding him to appear and answer. Section 1461, *supra,* declares in pertinent part that "If the alleged insane or incompetent person is not within the State the citation and a copy of the petition shall be delivered to him, personally." It is contended that Texas can thus acquire jurisdiction over a resident or nonresident incompetent as can California under the provisions of section 1461. But the proposition is not quite so simple; thus, with respect to the 1959 amendment it has been observed that "The section as amended might raise

---

[5]As indicated by subsequent acts and declarations, which the court accorded credence, the court determined that Mr. Mosier's residence was changed to California.

constitutional issues when guardianship over an absent resident or non-resident person is sought. See 1 Ehrenzweig, *Conflict of Laws,* §§ 27-33, 51 (1959)." (34 State Bar J. 747, 750.) Appellant Lee Richards has raised the constitutional question here by asserting that while the courts of California are required under the federal Constitution to give full faith and credit to the judicial proceedings of every other state (art. IV, § 1), they are not prohibited from inquiring into the grounds of jurisdiction of the sister state. The Texas court apparently found as a jurisdictional fact that Mr. Mosier was a resident of Texas, but it could not have found, save for personal service of the citation outside Taxas, the further jurisdictional fact which would be immune from collateral attack, namely, that Mr. Mosier had participated in such proceedings. In *Aldabe* v. *Aldabe,* 209 Cal.App.2d 453, 469-470 [26 Cal.Rptr. 208], after considerable discussion of the principles enunciated in *Sherrer* v. *Sherrer,* 334 U.S. 343 [92 L.Ed. 1429, 68 S.Ct. 1087, 1 A.L.R.2d 1355], the court stated: "Under the rule in *Sherrer* two conditions must combine before it can be said that California must give full faith and credit to the decree of a sister state: (1) the decree must be one not susceptible to collateral attack in the courts of the state which rendered the decree, and (2) there must be participation by the party aggrieved under circumstances which have afforded him full opportunity to contest the jurisdictional issues." There is no claim by appellants, nor could there be, that condition (2) has been met. Under the circumstances, the trial court properly drew the conclusion of law that the Texas judgment "is not entitled to full faith and credit under the Constitution of the United States of America."

▮▮▮ As an additional ground of appeal, appellants complain that the court abused its discretion by proceeding with the trial in the physical absence of Mr. Mosier. The point is not sustainable. As applicable here, section 1461 provides that the alleged incompetent if able to attend "must be produced at the hearing, and if he is not able to attend by reason of physical inability or by reason that the presence of such person in court would retard or impair the recovery of such person or would increase his mental debility, such inability or harmful effect must be evidenced by the affidavit or certificate of a duly licensed medical practitioner, . . ." Such affidavit was filed by Louis E. Martin, M.D., a practitioner of some 38 years, in connection with the first scheduled hearing which

was continued (as mentioned earlier) at the request of appellant's counsel. At the present hearing Dr. Martin was present in court and testified to his patient's inability to attend unless such attendance were limited to not more than two hours; in the opinion of the witness, any "prolonged attendance" would have had an adverse effect. He was cross-examined by appellants' counsel after which, during a colloquy between court and respective counsel, Mr. Andress (appellants' attorney) stated: "Now, let me say this, either Mr. Mosier is able to be present at this hearing as this states, or Mr. Mosier is not going to be able to come in at the instance of the conservator for a short period of time to give testimony and then be physically unable to go forward. *So if the Court's determination is that Mr. Mosier is physically unable and shouldn't be brought in, then we want it clearly understood that he shouldn't be brought in at all."* (Italics added.) The court then denied appellants' motion, previously made, that the conservator be required to arrange for Mr. Mosier's attendance, and the hearing proceeded in his absence. There was no abuse of discretion as urged by appellant, particularly in light of her counsel's decision to abide by the determination of the court as to whether her father should (or should not) attend the hearing. Such decision was made after consideration of expert testimony on the issue and is therefore substantially supported. Nonetheless she now asserts that her father, had he been present, would have had an opportunity to express his true feelings about the conservatorship; but the possibility of such free expression was presumably weighed by the court against the further possibility that his attendance would have retarded or impaired his recovery (as enjoined in the governing statute).

The trial court also erred, according to appellant Lee Richards, in appointing as guardian a stranger, respondent Meserve, in preference to herself, the incompetent's next of kin. ▮▮▮ Unlike the law governing the guardianship of a minor (Prob. Code, § 1406); no preference exists with respect to the appointment of a guardian of an incompetent; hence, any competent person may be chosen to act in such capacity (*Matter of Coburn*, 165 Cal. 202, 218 [131 P. 352]), and there is no requirement that such person be a resident of this state. (*Guardianship of Boutz*, 24 Cal.App.2d 644, 646-647 [76 P.2d 154].) In the case last cited, involving the guardianship of the person as well as the estate, the court however pointed out that " 'While in the absence of statutory provisions to the con-

trary, *a nonresident may be appointed guardian* [court's emphasis], such appointments are not favored, the rule being that a resident should be appointed rather than a nonresident, unless some very strong reason for appointing the latter is made to appear.' '' (P. 647.) In *Estate of Rosin,* 226 Cal. App.2d 166, 172 [37 Cal.Rptr. 830], the above statement from *Boutz* is quoted in connection with the court's observation that while section 1580, subdivision (6) of the Probate Code does not prevent the appointment of a nonresident as guardian, it "lists removal from the state as one of the grounds authorizing a court to remove a guardian theretofore appointed." ▆▆ Appellant challenges the finding that she is not a fit and proper person to be appointed the guardian of her father's person, although she admitted (under interrogation by her own counsel) that she intended to take her father back to her home in Texas if the court selected her as his guardian. There is a reasonable basis for the conclusion that this would not be conducive to the well-being of the incompetent in view of the determination implicit in the finding of residence here that he left Dallas because of his dislike for the living conditions at the Richards' home. ▆▆ And even if she proceeded to Texas without her father, but as the appointed guardian of his person, her duties as such guardian would have to be indirectly discharged by others although the law recognizes that her personal attention thereto is demanded. (*Guardianship of Howard,* 218 Cal. 607, 610 [24 P.2d 486].)[6] ▆▆ Because the paramount consideration is the welfare of the ward, a large discretion in the appointment of his guardian is necessarily vested in the trial judge. (*Guardianship of Boutz, supra,* pp. 646-647.) To prevail on this point, appellant was required to establish that such discretion was clearly abused; on the present record she has failed to make that showing.

▆▆ But did the court abuse its discretion in appointing respondent Meserve? We think not. He is described as "the highly partisan attorney of a blood relative [Mrs. Moorhead]" for whom he "stooges." As for Mrs. Moorhead,

---

[6] We are aware, of course, that an order could have been made, had appellant been appointed guardian, permitting her to fix the place of her father's residence elsewhere than California. (Prob. Code, § 1500; *Guardianship of Levy,* 137 Cal.App.2d 237 [290 P.2d 320].) Appellant relies on *Levy* which upheld an order appointing a nonresident as the guardian of the ward concerned; but it did so because, among other things (and as now to be noted), wide discretionary powers are given the trial court in such matters.

appellants assert that she has been "her enemy since the adoption 29 years ago interfered with her aunt's prepossession with entailment." It is still further asserted that this respondent has only seen Mr. Mosier on six occasions in some 15 or 16 months and that his primary loyalty is to someone admittedly hostile to her, which matters along with certain professional "improprieties" commencing with Mr. Mosier's arrival in California and continuing through the course of this bitter litigation, combine to render him unfit to act as guardian of her father's person. Given special consideration by appellants are the circumstances under which this respondent met the present incompetent and the interview which followed. He is also criticized for participating in the trial as an attorney and taking the witness stand. It seems, however, that he was "associated" with other counsel in representing himself as temporary conservator, which exception to the general rule is recognized in *Scott* v. *Times-Mirror Co.*, 181 Cal. 345, 370 [184 P. 672, 12 A.L.R. 1007]. It is also pointed out that he voluntarily took the stand and testified (over objection) to assertedly privileged communications between himself and Earl Mosier. Supporting her criticism of Meserve's conduct in this regard, appellant cites *Hotaling* v. *Hotaling,* 187 Cal. 695 [203 P. 745], where it is stated that the practice of a lawyer occupying the dual capacity of attorney and witness is ordinarily not to be encouraged. But there are other statements in *Hotaling* which are applicable here and not helpful to appellant: "We are of the opinion that too much importance has been given, and too much irritation developed, over the fact that much of the evidence for the plaintiff was given by one of the attorneys in her behalf, as a witness in the case. So far as the court is concerned such testimony is to be received and considered, as that of any other witness, in view of the inherent quality of his testimony, his interest in the case, and his appearance on the witness-stand. . . . We have scarcely referred in this opinion to the elaborate and resourceful discussion of learned counsel of the questions of law involving confidential relations, and burden and degree of proof, and have but touched upon a review of the voluminous evidence, because of the fact that it is too manifest that any nice distinctions in these matters are foreclosed by the findings of the trial court on the outstanding issue" (pp. 708-709); and we paraphrase that respondent Meserve is a fit and proper person to be the guardian of the person of Earl G. Mosier, an incompetent. Such finding was made after listening to all the

arguments, renewed in appellants' brief, reflecting on Meserve's fitness; it was made after a showing that in his present treatment Mr. Mosier is improving; it was made after according credence to testimony that the incompetent prefers to remain in California, which was determined to be his domicile, and that his present improvement would be retarded if returned to Dallas. For the reason that such evidence is substantially supported, as well as for the further reason that no clear abuse of discretion has been shown, the determination of Meserve's fitness must be upheld.

Finally, it is contended that the trial court erred in appointing a temporary conservator to serve during the pendency of the appeal from its order appointing guardians of the person and estate of the incompetent, and that such conservatorship is void. Such contention is made notwithstanding her counsel's suggestion, when objections to proposed findings were being argued, that ''a temporary conservatorship, in the event of an appeal, would continue to the extent legally necessary.'' We are of the opinion that section 2102 of the Probate Code supports the action taken by the court which continued the powers of the temporary conservatorship: ''An appeal from any judgment, order or decree shall stay the operation and effect thereof, except that, for the purpose of preventing injury or loss to person or property, the trial court may direct the exercise of the powers of the conservator, or may appoint a temporary conservator to exercise such powers, from time to time, as though no appeal were pending, and all acts of the conservator or temporary conservator pursuant to such directions shall be valid, irrespective of the result of the appeal.''

The order is affirmed.

Wood, P. J., concurred.

Fourt, J., dissented.

Appellants' petition for a hearing by the Supreme Court was denied December 28, 1966.